899 A.2d 879

**JOHN CRANE, INC., et al.**

v.

**David PULLER, Individually, etc., et al.**

**No. 1772, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

May 31, 2006.

8

Michelle D. Siri (Robert T. Connor, Thomas P. Bermier, Segal, McCambridge, Singer & Mahoney, Ltd., on the brief), Baltimore; Michael A. Pollard (Baker & McKenzie, on the brief), Chicago, IL; (Deborah L. Robinson, Peter A. Woolson, Bassel Bakhos, Robinson Woolson, P.A., on the brief), Baltimore, for Appellants.

Edward J. Lilly (Scott D. Shellenberger, Andrew M. Cantor, on the brief), Baltimore, for Appellees.

Panel: SALMON, DEBORAH S. EYLER, and CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

CHARLES E. MOYLAN, JR., Judge (retired, specially assigned).

As is almost inevitable from the very nature of asbestos-related litigation, this is an unwieldy appeal. We might as readily be dealing with separate appeals from separate trials involving separate and non-overlapping sets of litigants. The respective defendants have filed separate appellant's briefs. The respective sets of plaintiffs have filed separate appellee's briefs. By way of our own internal organization, we will proceed as if we were considering distinct and essentially unrelated appeals. Only when we come to three verbatim

issues raised by each of the two sets of plaintiffs in identical cross-appeals will we consolidate our discussion and disposition.

The two original plaintiffs, both now deceased mesothelioma victims represented by surviving family members and personal representatives, were 1) Milton Cichy (Cichy) and 2) Reginald Puller (Puller). Both of their claims were heard, in a consolidated trial, by a Baltimore City jury, presided over by Judge Allen L. Schwait, that ran from April 15, 2004, through May 5, 2004.

### The Cichy Case

One of the cases was brought by Milton Cichy and his wife, Jeanette Cichy, in 2002 against John Crane, Inc. (and against 18 other corporate defendants, not one of which remains as a party to this appeal) as part of the "Bethlehem Steel Cases Master Complaint." Cichy died on January 25, 2003. His claim is now being pursued by 1) Jeanette Cichy, individually and as Personal Representative of Cichy's Estate; 2) Jeanette Cichy, as surviving spouse of Cichy; and 3) Maria Cichy-Knight, surviving child of Cichy (collectively, "the Cichy plaintiffs"). On May 5, 2004, the jury returned verdicts in favor of the Cichy plaintiffs and against the appellant-defendant, John Crane, Inc., which, when adjusted by post-trial motions, amounted to $1,025,554.60.

Aggrieved at the award in favor of the Cichy plaintiffs, Crane raises the contentions

1. that the evidence was not legally sufficient to prove that exposure to John Crane's products was a substantial contributing factor to the development of Cichy's mesothelioma;

2. that Judge Schwait erroneously ruled that the Cichy plaintiffs were not barred from relitigating certain dispositive issues by the doctrine of collateral estoppel;

3. that Judge Schwait erroneously failed to apply Maryland's cap on non-economic damages to the survival claim; and

4. that Judge Schwait erroneously admitted into evidence testimony and exhibits in violation of the Maryland Rules of Evidence.

### The Puller Case

The other case now before us was brought by Reginald Puller and his wife, Olivia Taylor Puller, against Garlock Sealing Technologies, LLC (and, by our best reckoning, 46 other corporate defendants, not one of which remains as a party to the appeal) as part of the "Other Asbestos Cases Master Complaint" on December 5, 2001. Puller died on November 9, 2002. His claim is now being pursued by Olivia Taylor Puller, surviving spouse, and David Puller, surviving child and Personal Representative of Puller's Estate (collectively, "the Puller plaintiffs"). On May 5, 2004, the jury returned verdicts in favor of the Puller plaintiffs and against the appellant-defendant, Garlock Sealing Technologies, LLC, which, when adjusted by post-trial motions, amounted to $2,551,763.68.

Aggrieved at the awards in favor of the Puller plaintiffs, Garlock raises the contentions

5. that the evidence was not legally sufficient to support the verdict in favor of the Puller plaintiffs for economic damages;

6. that Judge Schwait erroneously failed to dismiss the claim of Olivia Taylor Puller based on the fact that she was not legally married to Puller at the time he filed his claim;

7. that Judge Schwait erroneously denied Garlock's motion for judgment as to its cross-claims against the erstwhile defendants 1) Keeler Boiler Corp. and 2) Uniroyal, Inc.; and

8. that Judge Schwait erroneously failed to submit to the jury the question of the application of Maryland's statutory cap on non-economic damages.

### The Cross–Appeals

Both the Cichy plaintiffs and the Puller plaintiffs have raised precisely the same three issues on cross-appeal. All three concern the applicability of the statutory cap. Both sets of plaintiffs contend

9. that the statutory cap was erroneously applied to the awards for non-economic damages for the loss of consortium;

10. that a single cap was erroneously applied to the verdicts for 1) loss of consortium and 2) wrongful death; and

11. that the statutory cap should not have been applied to the wrongful death claims.

## I. Cichy v. John Crane, Inc.

Milton Cichy went to work for the Bethlehem Steel Corporation in Sparrow's Point in 1947. He worked there continuously for 42 years, retiring in 1989. He worked initially as an electrical lineman but shortly thereafter transferred to the pipe fitters shop. He continued to work in the pipe fitters department, first as a pipe fitter helper and then as a master pipe fitter, for most of his 42 years with Bethlehem Steel. In the course of that employment, he worked virtually everywhere in the plant.

### 1. Legal Sufficiency of the Evidence

Crane moved for a judgment in its favor on the issue of whether there was enough evidence to go to the jury to permit a finding that Cichy's exposure to Crane's products was a substantial contributory factor to the development of Cichy's mesothelioma. Judge Schwait denied the motion, and Crane now contends that that denial was erroneous.

In denying the post-trial motion in which Crane again raised the question of the legal sufficiency of the evidence on this issue, Judge Schwait ruled:

Defendants correctly state that in order to establish necessary proximate causation in an asbestos related case, plaintiffs must introduce evidence that the conduct of the

Defendants was a substantial factor in bringing about the injuries. *Eagle–Picher Indus. v. Balbos,* 326 Md. 179, 604 A.2d 445 (1992). In order to find substantial factor causation the fact finder must evaluate the nature of the product, the frequency of its use and the regularity of the plaintiffs exposure to that product over an extended period of time. *The Court agrees with the plaintiffs that the totality of evidence was sufficient to meet the Balbos standard and the jury could have and did reach that conclusion.*

(Emphasis supplied).

In affirming that ruling, we find dispositive the decision of this Court in *Garlock, Inc. v. Gallagher,* 149 Md.App. 189, 814 A.2d 1007, *cert. denied,* 374 Md. 359, 822 A.2d 1224 (2003). Both in terms of this precise issue and in terms of the cast of expert witnesses, what is now before us essentially replicates what was before us in *Garlock v. Gallagher.* In that case, the deceased mesothelioma victim had been a pipe fitter for Bethlehem Steel at Sparrows Point from 1946 until his retirement in 1979. In that case, the defendant, as here, was John Crane, Inc.

In a videotaped *de bene esse* deposition, taken on October 28, 2002 and played for the jury at trial, Cichy testified that he regularly worked on pipes that contained steam, acid, water, and hydraulic fluids. He regularly installed and replaced both gaskets and packing, which he identified as being manufactured by Crane. The gaskets were cut from sheets of gasket material and the process required the sheet to be beaten with a hammer. That action caused the release of dust in the area in which Cichy was breathing. Cichy sometimes used a gasket cutter, which also produced dust when the sheets were cut.

When a new gasket had to be installed, Cichy would have to scrape off the old gasket. He testified that the old gaskets were usually difficult to remove, particularly on steam lines, because they were baked on. When Cichy used a scraper to remove an old gasket, it invariably caused dust. Sometimes he used a wire brush which was powered by electricity or air

pressure and that procedure created substantial dust. Cichy testified that while attempting to remove an old gasket, he was surrounded by floating dust. On almost every job that he worked on, there were gaskets that had to be removed. It was established that during the years of Cichy's employment, the gaskets used by Bethlehem Steel were manufactured by John Crane, Inc.; by Garlock; and by a few other unnamed manufacturers.

Cichy testified that he also regularly worked on valves, and that he used asbestos packing to keep the valves from leaking. When working on a valve, Cichy had to remove the packing, a process that created dust. Sometimes he blew out the valves with an air hose, which caused substantial dust. He also used the air hose to blow the asbestos dust off of his clothing. During the pertinent time of Cichy's employment, the packing used by Bethlehem Steel was manufactured by John Crane, Inc. and by Garlock. Cichy testified that on virtually every job on which he worked, he was required to remove and install John Crane, Inc. products.

In *Garlock v. Gallagher,* 149 Md.App. at 196–97, 814 A.2d 1007, the videotaped deposition of the deceased Richard Gallagher was essentially indistinguishable from Cichy's videotaped deposition in this case.

The labyrinth of pipes in the steel plant carried steam and corrosive fluids, which needed to be contained and not released into the surrounding environment. For the better part of Gallagher's work life, the plant used asbestos, a natural mineral product, to insulate the pipes and maintain the flow of materials. *Gallagher's primary asbestos exposure derived from gaskets, which pipe fitters use to seal the "flanges," or connections, between pipes. Gallagher explained that he cut and shaped gaskets prior to installation, and removed old gaskets by hand scraping or power grinding, two processes that produced visible dust. He identified Crane gaskets, as well as some other brands, and testified to working with these products "everyday."* Moreover,

Gallagher described his asbestos exposure from insulation, pipe covering, and cement products.

(Emphasis supplied).

Crane's argument in this case essentially duplicates the argument it made in *Garlock v. Gallagher*:

Crane argues plaintiffs failed to meet that burden of proof because they presented "no evidence" of the frequency of Gallagher's use of Crane's products, and "no competent expert testimony" that Crane's products, particularly its gaskets, produced respirable asbestos fibers in amounts sufficient to cause disease.

149 Md.App. at 200, 814 A.2d 1007.

The testimony of Cichy, as a fact witness, could not alone establish the case for the Cichy plaintiffs. It was supplemented, however, by the expert testimony of Dr. John McCray Dement, a professor of occupational and environmental medicine at the Duke University Medical Center. Dr. Dement testified that in the context of the Bethlehem Steel plant, visible dust would indicate a concentration of asbestos in excess of the established standards for a healthy work environment and would indicate that the process was not well controlled and it is likely that a health hazard would have existed. He testified:

Q. And, Doctor, do you have an opinion based upon a reasonable degree of scientific certainty as an industrial hygienist *if an individual were working with an asbestos-containing product, that he described to this jury seeing visible dust,* do you have an opinion as to whether or not that dust would be over that five million particles per cubic foot of air level?

A. Well, there is a good probability that it is. Hygienists, historically [looking] for things like asbestos and silica and other types of dusts, have used a visible dust cloud, a cloud in the area as an indication when the process is not well controlled and it [is] likely that a health hazard exists.

Q. And *does* that type of situation, *seeing visible dust clouds from an asbestos product, increase one's risk for developing mesothelioma?*

A. *Certainly it would indicate an exposure of increased risk, yes.*

(Emphasis supplied).

With respect to the significance of visible dust, this Court specifically observed in *ACandS, Inc. v. Abate,* 121 Md.App. 590, 672, 710 A.2d 944 (1998):

Dr. John McCray Dement, an expert witness for the plaintiffs, testified to the effect that, *whenever any asbestos-containing product is manipulated to the extent that it creates visible dust, "a very significant health hazard" is presented.*

(Emphasis supplied).

Important links in the chain of evidence wrought by the Cichy plaintiffs were two expert witnesses: 1) Dr. William Longo, a doctor of engineering specializing in materials science; and 2) Dr. James R. Millette, a Ph.D. in environmental science from the School of Engineering of the University of Cincinnati. Dr. Longo testified to having performed tests on gaskets and packing to measure fiber release during the types of operations described by Cichy. Dr. Longo had analyzed Crane asbestos sheet gaskets and found that the material contained asbestos. He also analyzed Crane packing and found that it contained asbestos.

Dr. Longo's testing of the gaskets involved using a wire brush or an electric wire brush to clean a flange surface. The measuring equipment revealed that significant amounts of asbestos fibers were released into the subject's breathing zone. He further testified that gaskets used on acid piping, which Cichy had also described, would have contained crocidolite asbestos, because chrysolite asbestos, used in the majority of gaskets, could not withstand the corrosive effects of acid.

Dr. Longo also performed a valve packing study, which involved removing and replacing the packing in valves. As-

bestos fibers were released into the breathing zone of the person performing the operation. During the removal and installation of gaskets, the air sampling monitor showed exposure to asbestos of approximately 440 times background rate. He also testified as to the results of air sampling during the removal and installation of packing. The monitor showed exposure to asbestos 20–30 times the background level.

Dr. Millette was accepted as an expert in environmental sciences, microscopy, identification and analysis of asbestos fibers, and material science. He examined Crane sheet gaskets and found asbestos fibers protruding from the sheet packing, which was proof that the asbestos is not fully encapsulated by the binder. He determined that Crane gaskets contained asbestos and that the fibers would be released into the air if the sheet material were disturbed. He cut the material and observed microscopically that asbestos fibers were released. He also demonstrated that asbestos fibers would be released by Crane gaskets when the gaskets were simply tapped with a screwdriver.

Dr. Millette also performed a test in which a valve was disassembled in a closed chamber and the gasket was removed in the manner described by Cichy's testimony in this case. The removed gaskets, which were essentially the same as the Crane gaskets, were found to contain very high concentrations of asbestos. The air, after sixteen minutes of scraping the old gaskets, had a fiber content 35 times background and 14,000 times ambient air. Dr. Millette also tested Crane packing and found that it contained 50% asbestos. He performed a study involving the removal of packing from valves and found that the packing material released asbestos fibers. The result was an asbestos content of the air 33 times background and 20,000 times that found in ambient air.

In *ACandS v. Abate*, 121 Md.App. at 671, 710 A.2d 944, we had observed with respect to similar testimony by Dr. Millette:

> Dr. James R. Millette, who testified as an expert witness for the cross-plaintiffs and whose testimony was adopted by the

plaintiffs, testified that *gaskets and packings,* in general, are not considered 'friable'—that is, they do not emit respirable asbestos fibers—but they *become friable if "cut or torn."*

(Emphasis supplied).

In *Garlock v. Gallagher,* 149 Md.App. at 197–98, 814 A.2d 1007, both Dr. Longo and Dr. Millette offered essentially the same conclusions that they offered in this case.

Along with setting out Gallagher's exposure history, plaintiffs sought to establish the dangerousness of the asbestos products. First, *William Longo, Ph.D., testified as an expert in the evaluation of asbestos-containing materials.* He studied Crane gaskets and determined them to contain between sixty and seventy percent chrysotile asbestos. Second, James Millette, Ph.D., testified as an expert in environmental science, microscopy, and the identification and quantification of asbestos fibers. He also studied a certain type of Crane gasket and determined it to contain about eighty percent chrysotile asbestos. *Dr. Millette* offered more complete testimony than Dr. Longo, because *besides testing the asbestos content of Crane gaskets, he* had *studied the amount of asbestos fiber emitted into the air when workers used those gaskets in the course of routine pipe fitting.* Both experts supplemented their complicated testimonials with videotaped demonstrations.

(Emphasis supplied).

From the combination of different witnesses, each supplying a different perspective and a different fragment of the total case, the jury in *Garlock v. Gallagher* found in favor of the Gallagher plaintiffs.

The jury found that asbestos caused Gallagher's mesothelioma, Crane's products were a substantial contributing factor in the development of the disease, and that Crane was both negligent in, and strictly liable for, the use of its products.

149 Md.App. at 199, 814 A.2d 1007. We had no difficulty in finding the evidence to be legally sufficient to support the

verdict in that case. We similarly have no difficulty in reaching the same conclusion in this case.

Crane's reliance on *Bartel v. John Crane, Inc.*, 316 F.Supp.2d 603 (N.D.Ohio 2004), is misplaced. That case is totally inapposite. In that non-jury case, the fact-finding judge was not persuaded to find in favor of the plaintiffs as a matter of fact. The fact-finding jury in this case, on the other hand, was so persuaded. The issue before us, however, has absolutely nothing to do with the burden of persuasion.

This issue concerns only the burden of production, which is the only burden that can be decided as a matter of law. The Cichy plaintiffs met their burden of production, and the fact-finding jury, like the fact-finding judge in *Bartel v. John Crane, Inc.*, was on its own to go in whatever direction it was persuaded to go, free of further legal impediment. Once the burden of production has been satisfied, the appellate deference that is due to the unfettered discretion of the ultimate fact finder has been well expressed by *Garlock v. Gallagher.*

We must review this claim of insufficient evidence through the lens of a motion for judgment, because that is how it surfaced at trial. A court may grant a motion for judgment only after it "consider[s] all evidence and inferences in the light most favorable to the party against whom the motion is made." Thus, *we are not [privileged] to dissect the evidence and weigh the credibility of its messengers, which is what Crane has asked us to do. See Owens– Corning Fiberglas Corp. v. Garrett,* 343 Md. 500, 521, 682 A.2d 1143 (1996) (stating that *"it is not the province of an appellate court to express an opinion regarding the weight of the evidence").*

Plaintiffs presented evidence of: (1) Gallagher's exposure to asbestos, in the form of his deposition testimony and his co-worker's live testimony; (2) the asbestos content of Crane's gaskets, through the testimony of a handful of experts; and (3) how the exposure caused the development of cancer in Gallagher, with the testimony of another handful of experts. That there were weaknesses in the presenta-

tion of this evidence cannot concern us; *only the jury had the task of sorting out the evidence,* that which was weak and that which was strong. *We will not disturb its conclusion.*

149 Md.App. at 200–01, 814 A.2d 1007 (emphasis supplied). Nor will we disturb the jury's conclusion in this case.

## 2. Collateral Estoppel

In a nutshell, Crane contends that the Cichy plaintiffs were "barred from relitigating certain dispositive issues [against Crane] by the doctrine of collateral estoppel." On or about April 28, 1988, Milton Cichy (along with Jeanette Cichy, his wife) sued John Crane, Inc. and nineteen other corporate defendants in the Circuit Court for Baltimore City on the ground that he had been "diagnosed as having asbestos lung disease" after having worked at the "Bethlehem Steel Sparrows Point Steel Plant" where he had been exposed to asbestos "from 1947 through [1988]."

Crane's collateral estoppel claim hinges on the fact that, on March 9, 1992, Judge Marshall A. Levin signed an order accepting the voluntary dismissal with prejudice of the Cichy claim against John Crane, Inc. When Milton and Jeanette Cichy, in 2002, filed the present claim against John Crane, Inc., and 18 other corporate defendants, alleging that Cichy had been "diagnosed with mesothelioma on March 1, 2002," [1] Crane countered with the defense of collateral estoppel.

---

1. In *Owens–Illinois, Inc. v. Cook,* 386 Md. 468, 474–75 n. 4, 872 A.2d 969 (2005), Chief Judge Bell defined mesothelioma:

 The National Cancer Institute defines Mesothelioma as a disease in which cancer (malignant) cells are found in the sac lining the chest (the pleura) or abdomen (the peritoneum). This is a rare form of cancer and most people with malignant mesothelioma have worked on jobs where they breathed asbestos. *National Cancer Institute, Questions and Answers, Cancer Facts 6:36—Mesothelioma* (May 13, 2002).

 We have also described the disease of mesothelioma, "as a malignant tumor that forms in the body cavities, predominantly the thoracic and abdominal cavities. In the thoracic cavity, it directly invades and encases the pleura—the outside lining of the lung—and eventually occupies and eradicates the pleural space. It frequently will grow

## 20

## The Historic Litigational Context

Before we turn to the nuances of collateral estoppel law, we need to place that voluntary dismissal of March 9, 1992, in proper historic perspective. Having filed his initial claim, based on having contracted asbestosis, as early as April of 1988, Cichy was one of the relatively early asbestos claimants. His claim ultimately became part of a much larger group of complaints embraced within what became known as the "Bethlehem Steel Cases Master Complaint." It was consolidated with and became a part of the case of *Abate, et al. v. ACandS, Inc., et al.*, Consolidated Case No. 89236705, "known to the Maryland asbestos litigation industry as *Abate I.*" *ACandS v. Godwin*, 340 Md. 334, 341, 667 A.2d 116 (1995).

In *ACandS v. Godwin*, 340 Md. at 341–42, 667 A.2d 116, Judge Rodowsky described how a small residual but representative part of what had once been a much larger *Abate I* came to trial before Judge Levin from February 18 through August 10, 1992.

> *Abate I* is *the first trial after the consolidation* in the Circuit Court for Baltimore City *of 8,555 actions* involving claims for personal injuries or wrongful death allegedly resulting from exposure to asbestos. In that trial, held from February 18 to August 10, 1992 before Judge Marshall A. Levin, *certain common issues* relating to liability *were decided*, as well as all issues between six illustrative plaintiffs and certain nonsettling, trial defendants.

(Emphasis supplied).

Our present concern is with the infinitely larger part of what had initially been *Abate I* that did not come to trial. In *ACandS v. Godwin*, Judge Rodowsky described the litigational tidal wave that was threatening to overwhelm the Baltimore City court system as early as 1990.

---

into the lung and, over time, can metastasize to other structures, including the diaphragm and the abdominal cavity." *John Crane, Inc. v. Scribner*, 369 Md. 369, 378–379, 800 A.2d 727, 732 (2002).

In September 1987, when there were approximately 1,000 asbestos case filings in the Circuit Court for Baltimore City, *Judge Levin was administratively designated as the "judge in charge" of asbestos litigation* in that court. *By April 1990 the number of such cases in Baltimore City had increased to more than 4,900.* It was anticipated that asbestos cases would continue to be filed at the rate of up to fifty cases per week. Judge Levin had been applying alternative dispute resolution techniques, but with only limited success.

*The case management plan* in April 1990 *called for trying on all issues batches of ten plaintiffs' actions per consolidated trial.* This represented an increase from five plaintiffs' actions per consolidated trial caused by a reduction to two judges from the four judges previously available to try asbestos cases. If these cases were heard eleven months of the year, and if a new consolidation were set for trial in each of those eleven months before each of the two available judges, a maximum of 220 Baltimore City asbestos cases would be disposed of by trial or, with the incentive of a fixed trial date, by settlement. But *the queue of undisposed of cases would lengthen into the Twenty-first Century, because annual new filings were approximately ten times greater than the number of cases that could be tried in the same period.*

340 Md. at 342, 667 A.2d 116 (emphasis supplied).

Judge Levin's approach, in macrocosm, was to consolidate the claims and then to address the overall problem with a coherent grand strategy.

Against that background *Judge Levin determined to consolidate the common issues* of all of the Baltimore City asbestos cases *into one trial.*

The initial mass consolidation order of April 1990 applied to all asbestos personal injury and wrongful death cases in the Circuit Court for Baltimore City filed as of April 1, 1990 in which process was served by June 1, 1990. The principal

common issues to be decided in the consolidated phases of the trial were "state of the art" and punitive damages.

Also *pending as of April 1990 were more than 3,000 asbestos cases,* in total, in the circuit courts for Baltimore, Prince George's, Allegany, and Washington Counties. These cases were transferred to the Circuit Court for Baltimore City pursuant to Maryland Rule 2–327(d) for pretrial and for trial of common issues as part of the same consolidation.

340 Md. at 342–43, 667 A.2d 116 (emphasis supplied).

Quite obviously, 8,555 individual claims against over one hundred corporate defendants could not be litigated in a single trial. The trial venue could have been nothing less than a football stadium and the trial itself would have exceeded the life expectancies of all judges, jurors, attorneys, and litigants condemned to endure it. It would self-evidently have been an absurdity. Accordingly, Judge Levin's strategy was to leave thousands of particularized factual issues unlitigated for the moment and to focus on a relatively few common issues that could, once decided, serve as *stare decisis* for the myriad of trials that would inevitably follow in *Abate I's* wake.

Judge Levin, in molding the consolidation, determined that *the claims of six plaintiffs should proceed to complete disposition on all issues.* Three plaintiffs were selected by agreement of counsel for the consolidated plaintiffs, and three plaintiffs were selected by agreement of counsel for the consolidation trial defendants. *The purpose of trying these six illustrative claims in full was to give the jury a better understanding of the issues involved in an asbestos case.*

*Over one hundred different defendants had been sued, cumulatively, in the 8,555 actions* that were consolidated. Prior to trial, however, *the plaintiffs voluntarily dismissed their claims against all but fifteen of the defendants originally named.*

340 Md. at 343, 667 A.2d 116 (emphasis supplied).

That historic perspective will be important, as we are called upon to examine, pursuant to collateral estoppel principles,

what precise factual issues have actually been litigated on their merits and which have not. On the Cichy claim of 1988 specifically and in *Abate I* generally, nothing with respect to the appellant-defendant John Crane, Inc., was ever actually litigated. On the Cichy claim of 1988 specifically and in *Abate I* generally, nothing with respect to the original plaintiff Milton Cichy was ever actually litigated.

### *Res Judicata* and Collateral Estoppel Compared

In arguing collateral estoppel, Crane wanders blithely back and forth across a line that should pose a more formidable boundary between two very distinct bodies of law. In framing its contention, Crane uses, as it must, the language of collateral estoppel. It immediately seeks to apply to its collateral estoppel problem, however, a body of rules that is unique to *res judicata.* Our first job must be one of getting the categories straight.

As early as *LeBrun v. Marcey,* 199 Md. 223, 226–28, 86 A.2d 512 (1952), the Court of Appeals focused on the distinction between *res judicata* and collateral estoppel.

> *"The scope of the estoppel* of a judgment *depends upon whether the question arises in a subsequent action* between the same parties *upon the same claim or* demand or *upon a different claim* or demand. In the former case a judgment upon the merits is an absolute bar to the subsequent action. *In the latter the inquiry is whether the point* or question to be determined in the later action *is the same as that litigated* and determined *in the original action"....* "In the former case, the judgment, if rendered upon the merits, constitutes an absolute bar to a subsequent action. It is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.... But *where the second action between the same parties is upon a different claim* or demand, *the judgment in the prior action operates as an estoppel only as to those matters in issue* or

points controverted, *upon the determination of which the finding or verdict was rendered.* In all cases, therefore, where it is sought to apply the estoppel of a judgment rendered upon one cause of action to matters arising in a suit upon a different cause of action, *the inquiry must always be as to the point or question actually litigated and determined in the original action, not what might have been thus litigated and determined.* Only upon such matters is the judgment conclusive in another action."

(Emphasis supplied).

In *Sterling v. Local 438,* 207 Md. 132, 140–41, 113 A.2d 389 (1955), the Court of Appeals again noted the distinction between *res judicata* and collateral estoppel.

"... *If the second suit is* between the same parties and is *upon the same cause of action, a judgment in the earlier case* on the merits *is an absolute bar, not only as to all matters which were litigated* in the earlier case, *but as to all matters which could have been litigated* [res judicata]. *If,* in a second suit between the same parties, even though *the cause of action is different, any determination of fact, which was actually litigated* in the first case, *is conclusive* in the second case [collateral estoppel]."

(Emphasis supplied). See also *MPC, Inc. v. Kenny,* 279 Md. 29, 32, 367 A.2d 486 (1977); *Frontier Van Lines v. Maryland Bank & Trust Co.,* 274 Md. 621, 624, 336 A.2d 778 (1975); *Travelers Insurance Co. v. Godsey,* 260 Md. 669, 676, 273 A.2d 431 (1971).

In *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), the United States Supreme Court described the same distinction.

Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action. *Under the doctrine of collateral estoppel,* on the other hand, *the second action is upon a different cause of action and* the judgment in the prior suit *precludes relitigation of*

*issues actually litigated* and necessary to the outcome of the first action.

(Emphasis supplied).

██ The legal consequences of *res judicata* are far more sweeping than are those of collateral estoppel, as was noted by *MPC, Inc. v. Kenny,* 279 Md. at 33, 367 A.2d 486.

Suffice it to say that the question *whether this is a case of res judicata on the one hand or collateral estoppel on the other is one of critical importance. If,* for example, the two causes of action are the same, and *res judicata is* therefore *applicable, the first judgment would bar appellants,* as urged by appellee, *from raising any matters which could have been decided in that case,* including the claim for contribution being maintained here. *If, however,* we are not dealing with the same cause of action, *collateral estoppel* rather than res judicata *would apply* and *only those determinations of fact or issues actually litigated in the first case are conclusive* in this action.

(Emphasis supplied).

After reciting the history of the distinction in Maryland, Judge Wilner, in *Klein v. Whitehead,* 40 Md.App. 1, 389 A.2d 374 (1978), constructed a simple checklist for determining which doctrine applies in a given case.

With this background, *it is possible to construct a simple comparative checklist for determining which,* if either, *of the two doctrines is applicable.* For either to apply, the second action must be between the same parties or those in privity with them. For direct estoppel to apply, it must be shown, in addition, that the two causes of action are the same. *Collateral estoppel does not require that the causes of action be the same, but it applies only with respect to issues of fact actually determined in the earlier proceeding.*

40 Md.App. at 15, 389 A.2d 374 (emphasis supplied).

██ As Judge Adkins recently reiterated for this Court in *Thacker v. City of Hyattsville,* 135 Md.App. 268, 287, 762 A.2d 172 (2000), "issue preclusion" is perhaps an apter term

than collateral estoppel, just as "claim preclusion" is probably a better descriptive term than *res judicata.* In order to preclude the relitigation of a factual issue in a subsequent case between the same parties, the *sine qua non* is that the factual issue was **actually litigated on its merits** in the earlier case. Focusing on collateral estoppel or issue preclusion, *Janes v. State,* 350 Md. 284, 295, 711 A.2d 1319 (1998), provided a good working definition.

Collateral estoppel, or issue preclusion, began life and retains life as a common law doctrine. A common and well-established articulation of the doctrine is that *"[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment,* and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." *Murray International v. Graham,* 315 Md. 543, 547, 555 A.2d 502, 504 (1989), quoting from RESTATEMENT (SECOND) OF JUDGMENTS, § 27 (1982).

(Emphasis supplied).

What matters for purposes of collateral estoppel is not that a suit or a cause of action has been dismissed, by some modality or another and with or without prejudice. The Supreme Court pointed out in *Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), that the applicability of the doctrine depends exclusively upon whether an issue of ultimate fact has once been determined by a valid and final judgment.

"Collateral estoppel" is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that *when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.*

(Emphasis supplied). See also *Gibson v. State,* 328 Md. 687, 693, 616 A.2d 877 (1992) ("The collateral estoppel doctrine operates to a preclusive end, so that when an issue of ultimate fact has been determined once by a valid and final judgment,

that issue cannot be litigated again between the same parties in a future action."); *Cousins v. State,* 277 Md. 383, 398, 354 A.2d 825 (1976) ("Collateral estoppel prevents the State from litigating a second time an issue of ultimate fact where there has already been a final determination of that issue in the accused's favor."). And see *Colandrea v. Wilde Lake Community Assoc., Inc.,* 361 Md. 371, 761 A.2d 899 (2000).

In *Burkett v. State,* 98 Md.App. 459, 633 A.2d 902 (1993), *cert. denied,* 334 Md. 210, 638 A.2d 752 (1994), this Court went to great lengths to point out that the core concern of *res judicata* law is with the legal consequences of a final judgment in terms of precluding the subsequent relitigation of the same case.

> *Res judicata looks to a final judgment* on the merits earlier entered *in the same case* or same cause *and to the necessary legal consequences of that judgment.* ... *A claim that has once been litigated,* or that could have been litigated, *in the same case* by the same parties or their privies, *cannot,* in the interests of finality and repose, *be relitigated.* ... [I]t is a plea in bar, which is interposed in advance of trial so as to bar the defendant even from being brought to trial in a subsequent and sequential effort to relitigate a matter already legally settled.

98 Md.App. at 464, 633 A.2d 902 (emphasis supplied).

By contrast, the concern of collateral estoppel law is with the preclusion of duplicative fact-finding.

> Collateral estoppel shares with *res judicata* the requirement that the earlier litigation and the later litigation be between the same parties or their privies....
>
> At that point, however, *the two related legal doctrines part company. Collateral estoppel is concerned with the factual implications of an earlier litigation of a different case* whereas *res judicata is concerned with the legal consequences of a judgment* entered earlier *in the same case. Collateral estoppel is concerned,* therefore, not with the legal consequences of a judgment but *only with the findings of ultimate fact,* when they can be discovered, that necessar-

ily lay behind that judgment. *Res judicata, by contrast, is concerned with the legal consequences of a judgment* regardless of whether the judgment was based on the ultimate factual merits or on the basis of a legal ruling having nothing to do with the ultimate factual merits.

98 Md.App. at 464–65, 633 A.2d 902 (emphasis supplied).

The distinction is between "what happened legally" and "why it may have happened factually."

*Collateral estoppel is concerned only coincidentally with what happened legally; its special concern is with why it happened in terms of fact finding. Res judicata, by contrast, is concerned with what happened legally*—with the entering of a final judgment and *with the legal consequences of that judgment.* It does not matter *why* the judgment was entered in terms of antecedent fact finding. Its claim-preclusive effect arises out of its very existence, and there is no necessity to probe for its probable fact-finding basis.

*The effect of collateral estoppel,* when that doctrine is applicable, *is that of issue preclusion (meaning an issue of ultimate fact). A finding of ultimate fact that has once been made in favor of a party cannot later be relitigated adversely to that party, even in the trial of a different case.*

98 Md.App. at 465, 633 A.2d 902 (emphasis supplied).

In resolving this contention, we must ask on which side of the *res judicata*-collateral estoppel boundary line do we find ourselves? Unlike John Crane, Inc., we may not casually amble back and forth, picking first an attractive principle from one category and then a tempting morsel from the other. It is either a case of claim preclusion or one of issue preclusion, each with a different set of rules. It is not an undifferentiated mixture of both.

### Asbestosis Versus Mesothelioma: Separate and Distinct Claims

Which set of measuring devices we bring to bear on this contention depends on the relationship between two claims: 1)

the earlier claim filed by Cichy and his wife against John Crane, Inc. on April 28, 1988 and voluntarily dismissed by them on March 9, 1992; and 2) the subsequent claim against John Crane, Inc., filed in 2002 and on which the Cichy plaintiffs prevailed on May 5, 2004. Were those claims one and the same? If so, we are properly in the world of *res judicata*. Or were they different claims? If so, we are in the very different world of collateral estoppel.

The respective claims were, to be sure, between the same parties or those in privity with them. The plaintiff in each case was either Cichy or Cichy's relatives and survivors. The defendant on both occasions was John Crane, Inc. The trials of the two cases, had they both come about, would have involved, moreover, a heavy overlap of factual issues. Notwithstanding these significant common features, however, the two claims were not the same.

One difference between the two claims, of course, is that Milton Cichy was alive throughout the pendency of the first claim. It was dismissed on March 9, 1992, and he did not die until January 25, 2003. The second claim, prosecuted by the Cichy plaintiffs and resulting in the jury award as of May 5, 2004, included a wrongful death count for the benefit of Cichy's surviving spouse and surviving child. That, however, is *not* the critical difference on which we ground our holding that the two claims, the two cases, the two causes of action, were not one and the same.

The first claim brought by Cichy against Crane was based on the allegation that he had contracted asbestosis from being exposed to Crane's asbestos-bearing products. It was not until March 1, 2002, that Cichy was diagnosed with mesothelioma. The second claim was predicated exclusively on the allegation that, as a result of his exposure to Crane's asbestos-bearing products, Cichy had contracted mesothelioma.

Ingeniously, Crane seeks to embrace both asbestosis and mesothelioma under the all-embracing umbrella term "asbestos-related disease." Notwithstanding the linguistic camouflage, the distinction between the two is both discernible

and dispositive. A claim based on asbestosis is a different case or cause of action from a claim based on mesothelioma. Our conclusion in that regard is a synthesis of *Smith v. Bethlehem Steel Corp.*, 303 Md. 213, 492 A.2d 1286 (1985), and *Pierce v. Johns–Manville Sales Corp.*, 296 Md. 656, 464 A.2d 1020 (1983).

In *Pierce v. Johns–Manville,* the Court of Appeals had to decide whether the running of the statute of limitations on a claim based on asbestosis would bar the filing of a subsequent claim based on mesothelioma. In holding that claims based on those respective medical conditions were separate and distinct, the Court of Appeals relied in part on the affidavit of Dr. Russell S. Fisher, Chief Medical Examiner for the State of Maryland, in which he explained:

"The diseases of mesothelioma and lung cancer are also associated with prior exposure to asbestos by inhalation. Lung cancer is a malignant disease that involves the cells found within the substance of the lung and the airways of the lung. It is a progressive disease which nearly always kills the victim within a year of its diagnosis, in the inoperable state. The duration of the developmental process of lung cancer from inception to gross clinical manifestation cannot be stated with absolute certainty but modern medical opinion indicates this time lag to be of the order of months to a year or two at the extreme.

*"This kind of disease process is entirely different from the disease process involved with asbestosis,* though they both may be associated with an individual's exposure to the mineral asbestos.

*"It is a medically accepted fact that an individual who has been diagnosed with the disease of asbestosis will not inevitably contract either of the cancers mentioned above.* It is also true that *individuals who* have been exposed to asbestos and who *develop lung cancer or mesothelioma,* as a result of such exposure, *may well not have significant asbestosis.* These two situations are possible because, *although all three diseases are associated with the inhalation of asbestos fibers, there is at the present time no medically*

*accepted link between the development of malignant diseases and the development of asbestosis."*

Quoted at 296 Md. at 660–61 n. 4, 464 A.2d 1020 (emphasis supplied). From the evidence, the Court of Appeals concluded:

Here the record shows that *asbestosis and lung cancer are separate and distinct latent diseases that are not medically linked.*

296 Md. at 664, 464 A.2d 1020 (emphasis supplied).

Notwithstanding an earlier cause of action based on asbestosis, a cause of action based on lung cancer (mesothelioma) only accrues with the discovery of the lung cancer.

[W]hen exposure to asbestos initially results in the manifestation of asbestosis, and subsequently results in the manifestation of *lung cancer, a separate, distinct latent disease,* and no tort recovery has been sought for the harm resulting from asbestosis, *a cause of action for* the harm resulting from *lung cancer accrues when lung cancer is or reasonably should have been discovered.*

296 Md. at 668, 464 A.2d 1020 (emphasis supplied). And cf. *Owens–Illinois v. Gianotti,* 148 Md.App. 457, 478–81, 813 A.2d 280 (2002).

Before Crane seeks unwarranted solace in that opinion's apparent qualification "and no tort recovery has been sought for the harm resulting from asbestosis," it behooves us to turn immediately to *Smith v. Bethlehem Steel's* gloss on *Pierce v. Johns–Manville.* In *Smith v. Bethlehem Steel* there was a later claim based on an asbestos-related colon cancer, but there had also been an earlier claim based on asbestosis. In *Smith,* the defendant Bethlehem Steel Corp. sought precisely such solace in *Pierce's* apparent qualification.

There is, however, a legal question on the undisputed facts in this case. *The worker in Pierce never sued in tort for damages for asbestosis. Glen Smith has pending in the federal court a claim in tort against the original defendants for damages based on asbestosis. The Appellees argue that this is a material distinction between Pierce and the in-*

> *stant matter. They point out that at least eight times in the course of the opinion in Pierce reference was made to the absence of any effort to recover in tort damages based on asbestosis.*

303 Md. at 233, 492 A.2d 1286 (emphasis supplied). Judge Rodowsky, however, promptly laid that ghost of errant and gratuitous dicta to rest.

> Our review of *Pierce* convinces us that *the fact that the claimant there had not previously sued in tort for damages for asbestosis was not a factor material to the holding.* The rule in *Pierce* is precedent on the legal aspects of the Smiths' claims for damages based on colon cancer.

303 Md. at 234, 492 A.2d 1286 (emphasis supplied).

The Court of Appeals left no doubt that a cause of action claiming damages for asbestos-related lung cancer is separate and distinct from one claiming damages for asbestosis.

> We emphasize that the starting point for *Pierce* was the medical evidence that *lung cancer was a latent disease, separate and distinct from asbestosis. If Glen's colon cancer is similarly* a latent disease, *separate and distinct from his asbestosis, then* under the rationale of *Pierce the claims* of the Smiths based on Glen's colon cancer *assert causes of action separate from those claiming damages for asbestosis.*

*Id.* (emphasis supplied). And see *Sopha v. Owens–Corning Fiberglas Corp.,* 230 Wis.2d 212, 601 N.W.2d 627 (1999).

### A Separate Cause of Action

We have labored perhaps unnecessarily to establish this intermediate premise that a claim based on asbestosis and a claim based on mesothelioma are not the same claim, because Crane has arguably conceded this point by expressly framing its contention as one based on "the doctrine of collateral estoppel." If Crane thought that the two claims were one and the same, it would presumably have invoked the doctrine of *res judicata,* which it did not. The problem nonetheless persists that Crane seems to amalgamate the two doctrines

into an overarching super doctrine with no acknowledgment that they are distinct.

The claim based on asbestosis which the Cichys voluntarily dismissed against John Crane, Inc., on March 9, 1992, is **NOT THE SAME CLAIM** as that on which the Cichy plaintiffs recovered a judgment on May 5, 2004. The fact that two separate claims share a significant number of common factual issues did not fuse them into a single claim. Crane, in effect, concedes as much when, in its brief, it refers to Maryland as a "two-disease" state. The consequence of being a "two-disease" state is that each of the two diseases gives rise to a different claim. By definition, then, *res judicata* does not apply. Claim preclusion only operates to preclude subsequent attempts to relitigate **THE SAME CLAIM.** It does not preclude the subsequent litigation of **A DIFFERENT CLAIM.** Collateral estoppel or issue preclusion may cross the line from one claim to another claim sharing a common factual issue, but *res judicata* may not.

Crane nonetheless doggedly relies on the *res judicata* cases of *Claibourne v. Willis,* 347 Md. 684, 692, 702 A.2d 293 (1997) ("The dismissal with prejudice . . . has the same *res judicata* effect as a final adjudication on the merits favorable to the defendant."); *Langhoff v. Marr,* 81 Md.App. 438, 445, 568 A.2d 844 (1990); *Bodnar v. Brinsfield,* 60 Md.App. 524, 538, 483 A.2d 1290 (1984); *Parks v. State,* 41 Md.App. 381, 386, 397 A.2d 212 (1979) ("A dismissal 'with prejudice' has been held to be as conclusive of the rights of the parties as if the action had been prosecuted to a final adjudication on the merits adverse to the complainant."); *Byron Lasky & Assoc. v. Cameron–Brown,* 33 Md.App. 231, 234, 364 A.2d 109 (1976) ("A dismissal with prejudice is a final adjudication.").

The problem with that impressive array of case law is that it is utterly beside the point. Those cases all deal with *res judicata* law, not with collateral estoppel law. Crane insists, with evangelical fervor, that a voluntary dismissal with prejudice is an absolute and final disposition of a case or a claim. Of course, it is! We fully agree. It is an absolute and final

disposition of the case or claim that was dismissed. Any further claim based on asbestosis would, of course, have been precluded. That is what claim preclusion means.

The voluntary dismissal with prejudice that finally and absolutely disposes of the same claim, however, has no dispositive effect on a different claim. The cases relied on by Crane may all be in the right pew as far as dispositive effect is concerned, but they are in the wrong church. They are in the *res judicata* church, whereas we, in this case, are called upon to apply the dogma preached in the collateral estoppel church.

### What Is Meant By "Actually Litigated"?

At trial, Crane was unquestionably entitled to whatever protection was afforded by the doctrine of collateral estoppel. What precisely, however, is the scope of such protection? Crane was protected from having the Cichy plaintiffs attempt to re-litigate against it any issue of fact that had actually been litigated in its favor in the earlier suit. That is the extent of the protection. The pivot for marking off that protection is the participial phrase "actually litigated." What does it mean? And what does it not mean?

In *MPC, Inc. v. Kenny*, 279 Md. at 33, 367 A.2d 486, the Court of Appeals referred to the critical character of that criterion.

> *If,* however, *we are not dealing with the same cause of action,* collateral estoppel rather than res judicata would apply and *only those determinations of fact or issues actually litigated in the first case are conclusive in this action.*

(Emphasis supplied).

In *Welsh v. Gerber Products,* 315 Md. 510, 516, 555 A.2d 486 (1989), Judge McAuliffe pointed to actual litigation as the *sine qua non* of issue preclusion.

> A second aspect of the finality of judgments between the parties is the concept of issue preclusion. This principle, known as collateral estoppel, is that in a second suit between the same parties, even if the cause of action is different, *any determination of fact that was actually liti-*

*gated* and was essential to a valid and final judgment *is conclusive.*

(Emphasis supplied).

In *Murray International v. Graham,* 315 Md. 543, 547, 555 A.2d 502 (1989), the Court of Appeals again defined collateral estoppel in terms of an issue's having been actually litigated.

> "*When an issue of fact* or law *is actually litigated* and determined by a valid and final judgment, and the determination is essential to the judgment, *the determination is conclusive in a subsequent action between the parties,* whether on the same or a different claim."

(Emphasis supplied).

The distinction which Crane stubbornly refuses to recognize is that even a final and binding legal resolution of a case does not necessarily entail any actual litigation of factual issues. Crane continues to conflate the two very different phenomena. In the context, however, of collateral estoppel law and when the issue sought to be precluded is one of fact, the actual litigation of an issue of fact refers not to legal actions or rulings, which may have sweeping legal consequences, but only to the deliberative process of fact-finding by a fact-finding jury or judge. The fact finder receives and considers evidence on controverted issues of fact, assesses the credibility of the sources of the evidence, weighs the evidence, and, explicitly or implicitly makes findings of fact.[2] This is the core activity from which issue preclusion proceeds. It is not coterminous with the larger process of resolving a legal action. It is merely one aspect of one modality that sometimes (but not always) enters into that larger process.

There are a number of legal actions, procedures, and rulings that may have sweeping claim-preclusive consequences but

---

**2.** Whether a judge's ruling that the plaintiff's evidence on a controverted issue was legally insufficient, as a matter of law, to permit the jury to consider the issue would be an adequate trigger for subsequent issue preclusion is not before us and would, in any event, have no bearing on this case. Even if an appropriate trigger, however, it would still involve an actual judicial assessment of actual evidence.

that do not remotely entail any actual litigation of factual issues. In *United Book Press, Inc. v. Maryland Composition Co., Inc.,* 141 Md.App. 460, 477, 786 A.2d 1 (2001), Judge James Eyler quoted with approval from Comment (e) to the *Restatement (Second) of Judgments,* § 27 (1980).

> "*In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated.* There- fore, *the rule of [issue preclusion] does not apply* with respect to any issue in a subsequent action."

(Emphasis supplied). And see *Welsh v. Gerber Products, Inc.,* 315 Md. at 520–21, 555 A.2d 486 (citing *Restatement (Second) of Judgments,* § 27 and holding that a consent judgment does not have issue preclusive effect); *Porter Hayden Co. v. Bullinger,* 350 Md. 452, 713 A.2d 962 (1998) (default judgment does not have preclusive effect where issues of fact were not actually litigated); *Jones v. Baltimore City Police,* 326 Md. 480, 488, 606 A.2d 214 (1992) (probation before judgment does not have issue preclusive effect).

By a precise parity of reasoning, a civil plaintiff may dismiss with prejudice a cause of action or the State may nol pros a criminal charge even when the supporting evidence for the action or the charge might be overwhelmingly abundant. The legally binding consequences of the dismissal, when applicable, do not necessarily correlate in any way to evidentiary inadequacy on underlying factual issues. The thing that all of these binding legal actions—a nol pros, a confessed judgment, a consent judgment, a default judgment, a voluntary dismissal with prejudice—have in common is that they are not necessarily dependent on the actual litigation of any factual issue. The legal action, therefore, does not necessarily imply anything with respect to arguably subsumed factual issues.

Our concern, on this contention, is exclusively with the actual litigating of factual issues, if there was any such litigating. The approach prescribed by Judge Eyler in *United Book v. Maryland Composition,* 141 Md.App. at 479, 786 A.2d 1, for searching for evidence of actual litigating is highly pertinent.

*In determining whether an issue has been actually litigated, courts may* look beyond the judgment to *examine the* pleadings and *evidence presented in the prior case.* ("[F]or the doctrine of collateral estoppel to apply, *the probable fact-finding that undergirds the judgment used to estop must be scrutinized to determine if the issues raised* in that proceeding *were actually litigated,* or facts necessary to resolve the pertinent issues were adjudicated in that action.").

(Emphasis supplied).

■ Having now appropriately narrowed the scope of the search, it is self-evident that Crane has no collateral estoppel defense. In the earlier case brought by Cichy and his wife against John Crane, Inc., no issue of fact was ever litigated in Crane's favor that the later suit sought to re-litigate. Indeed, no factual issue involving either Cichy or Crane was ever litigated at all. The very purpose of Judge Levin's grand strategy in negotiating for Cichy and for 8,548 other plaintiffs to dismiss their suits against over 85 corporate defendants was to avoid any necessity for any actual litigation of any factual issues in that multitude of dismissed actions.

Except for the six plaintiffs and 15 defendants who actually went to trial in *ACandS v. Godwin* (*Abate I* ), none of whom is involved in this case, there was no actual litigation of any factual issue. Consequently, there was no predicate for any conceivable claim of collateral estoppel. Judge Schwait's ruling in that regard was eminently correct.

### 3. Maryland Cap on Non–Economic Damages

Crane's third contention is that Judge Schwait erroneously declined to apply Maryland's statutory cap on non-economic damages to the jury award on the survival claim. The Alpha and Omega of controlling law is Maryland Code, Courts and Judicial Proceedings Article, § 11–108(b), the "cap statute."

(b) *Limitation on amount of damages established.*—(1) In any action for damages for personal injury in which the

cause of action arises on or after July 1, 1986, an award for noneconomic damages may not exceed $350,000.

(2)(i) Except as provided in paragraph (3)(ii) of this subsection, in any action for damages for personal injury or wrongful death in which the cause of action arises on or after October 1, 1994, an award for noneconomic damages may not exceed $500,000.

(ii) the limitation on noneconomic damages provided under subparagraph (i) of this paragraph shall increase by $15,000 on October 1 of each year beginning on October 1, 1995. The increased amount shall apply to causes of action arising between October 1 of that year and September 30 of the following year, inclusive.

(3)(i) The limitation established under paragraph (2) of this subsection shall apply in a personal injury action to each direct victim of tortious conduct and all persons who claim injury by or through that victim.

(ii) In a wrongful death action in which there are two or more claimants or beneficiaries, an award for noneconomic damages may not exceed 150% of the limitation established under paragraph (2) of this subsection, regardless of the number of claimants or beneficiaries who share in the award.

The jury made three awards to the Cichy plaintiffs. With respect to two of those awards, Judge Schwait, post-trial, imposed the cap on the non-economic portions of the awards for wrongful death and for loss of consortium.[3] For non-

---

3. *Crane v. Scribner*, 369 Md. 369, 375, 800 A.2d 727 (2002), clearly dictated the application of the cap to the wrongful death action in this case.

Because *an essential element of a wrongful death action is the death of the person,* and it was undisputed that *Mr. Scribner died after October 1, 1994—the effective date of the cap on non-economic damages awarded in a wrongful death action*—there was little disagreement that the cap applied to the wrongful death action filed by Mrs. Scribner and the children and that the non-economic damages awarded in that action would have to be reduced.

economic loss, the jury had awarded the surviving spouse $1,000,000 and the surviving child $500,000 in the wrongful death action. It had also awarded the surviving spouse $2,000,000 for the loss of consortium.

Computing first the cap with respect to the surviving spouse, Judge Schwait calculated the initial cap figure as $500,000, pursuant to subsection (2)(i). He then, pursuant to subsection (2)(ii), raised the cap by $15,000 per year for each of the eight years between October 1, 1995, and Cichy's death on January 25, 2003, for an additional amount of $120,000 ($15,000 per year times 8). When added to the initial $500,000, that brought the total figure for the surviving spouse to $620,000. Pursuant to subsection (3), the additional wrongful death award for the second claimant (the surviving child) was allowed to increase the combined award from $620,000 by an additional 50%, for an increase of $310,000 to the surviving child and a combined total award of $930,000 for wrongful death and loss of consortium. Crane has lodged no objection to that application of the cap.[4]

The third award to the Cichy plaintiffs was for the survival action, brought on behalf of Cichy by the personal representative of his estate. The initial jury award for non-economic loss in the survival action was for $4,000,000. Judge Schwait declined to apply the statutory cap to that award and it is from that decision that Crane appeals.

As the cap statute itself makes clear, the critical date for applying the cap on non-economic damages is July 1, 1986. What we measure in terms of that temporal milepost is not whether the cause of action accrues "on or after" that date but whether the cause of action **ARISES** "on or after" that date. *Crane v. Scribner*, 369 Md. at 390, 800 A.2d 727, exhorts us to

---

(Emphasis supplied). See also *Anchor Packing v. Grimshaw*, 115 Md. App. 134, 154–55, 692 A.2d 5 (1997); *Owens–Illinois v. Hunter*, 162 Md.App. 385, 416–17, 875 A.2d 157 (2005).

**4.** The Cichy plaintiffs, however, do challenge, by way of their cross-appeal, the application of the cap to the award for the loss of consortium. We will deal with that issue when we consider the cross-appeal.

be aware of "the distinction made by the Legislature between when an action arises and when it accrues."

The early and late ends of the spectrum make the application of the statutory cap easy. It is in the intermediate range that application is more problematic. Judge Wilner set out with precision the three pertinent time periods.

> We thus hold that, in actions for personal injury founded on exposure to asbestos, *the court,* as an initial matter, *may look,* for purposes of § 11–108(b)(1), *to the plaintiff's last exposure to the defendant's asbestos-containing product. If that last exposure undisputedly was before July 1, 1986, § 11–108(b)(1) does not apply,* as a matter of law. *If the only exposure was undisputedly after July 1, 1986, then obviously the cap applies as a matter of law. In those hopefully rare instances in which there was exposure both before and after July 1, 1986, and there is a genuine dispute over whether either exposure was sufficient to cause the kind of cellular change that led to the disease, the trier of fact will have to determine the issue* based on evidence as to the nature, extent, and effect of the pre- and post-July 1, 1986 exposures.

369 Md. at 394, 800 A.2d 727 (emphasis supplied).

We are not at either end of that spectrum, either where the "last exposure undisputedly was before July 1, 1986" or when the "only exposure was undisputedly after July 1, 1986." Cichy's case does not exactly straddle the line, for the overwhelming bulk of his exposure was during his 39 years at Bethlehem Steel before July 1, 1986. His exposure to asbestos-bearing products produced by Crane may, however, have tiptoed across the July 1, 1986 line, and that is the occasion for the present dispute.

In those cases where there is significant exposure both before and after July 1, 1986, *Crane v. Scribner,* 369 Md. at 394, 800 A.2d 727, provides that "the trier of fact will have to determine the issue [of when the cause of action arose] based

on evidence as to the nature, extent, and effect of the pre- and post-July 1, 1986 exposures." [5]

■ Judge Schwait's ruling now under review was his decision not to submit to the jury the issue of when Cichy's cause of action arose. As Judge Wilner pointed out in *Crane v. Scribner,* 369 Md. at 394, 800 A.2d 727, there are two prerequisites for the generation of a mandatory jury issue:

1. "Exposure both before and after July 1, 1986"; and

2. "A genuine dispute over whether either exposure was sufficient to cause the kind of cellular change that led to the disease."

Arguably, there may have been some exposure of Cichy to Crane-manufactured asbestos after July 1, 1986. Our affirmance of Judge Schwait's decision is based on our conclusion that there was no genuine dispute as to the sufficiency of the pre–1986 exposure to cause the kind of cellular change that led to Cichy's mesothelioma, as opposed to the very minimal exposure that might have occurred after July 1, 1986. We cannot say that Judge Schwait abused his discretion in making that determination.

In reaching our conclusion, we do not place the heavy reliance that the Cichy plaintiffs do on the fact that Crane stopped manufacturing asbestos-containing products in 1985. There would be no exposure of a pipefitter to asbestos in installing new Crane gaskets and packing after 1985, of course, but there would still be exposure in removing older Crane gaskets and packing, that have a life expectancy of 12 to 15 years. It is true that with each passing year and with each replacement of an old product with a new product, there would be a gradual lessening of the Crane-asbestos presence in the total Bethlehem Steel environment, but there would not

---

**5.** The jury, however, may not be informed of the significance of its determination as to when the cause of action arose. It is never told about the existence of a statutory cap. Section 11–108(d)(1) provides:

In a jury trial, the jury may not be informed of the limitation established under subsection (b) of this section.

be a total disappearance for several decades. The minimalization relied on by the Cichy plaintiffs would be, at best, a very peripheral factor in our analysis.

Our primary focus is on Cichy himself. He went to work for Bethlehem Steel in 1947 and, for most of the next four decades, worked as a pipefitter with massive daily exposure to asbestos fibers and asbestos dust. As of the critical meridian of July 1, 1986, Cichy had been working at Bethlehem Steel for 39 years and was 63 years old. He did not retire for another two or three years, to be sure, but he was transferred, for his last three or four years on the job, to the fabrication shop. Ideally, we would like to have seen this developed more fully, but in his videotaped deposition Cichy testified:

"Question: The last few years you worked just in the shop fabricating; is that right?"

"Answer: Yeah. Fabricating."

"Question: So the last couple years you were there, you would not have done much work with gaskets?"

"Answer: Well, like I said, you know, when I fabricated, sometimes I put in my own jobs. So you go to the steel side. Most of the time for big jobs were the steel side."

All of the testimony about asbestos exposure had been with respect to the work of a pipefitter in installing and removing gaskets and packing. There was no indication anywhere in the record that the fabrication shop or the life of a fabricator involved any exposure to asbestos. There may have been no exposure at all of Cichy to asbestos after July 1, 1986. If there were any such exposure, it may have been very minimal. Judge Schwait did not abuse his discretion in declining to submit this issue to the jury.

In terms of the generation of a jury question, *Crane v. Scribner*, 369 Md. at 394, 800 A.2d 727, modifies the noun "dispute" with the qualifying adjective "genuine." Our reading of "genuine dispute" is that a plausible likelihood of either of two events gives rise to a genuine dispute, but that an overwhelming likelihood of one versus a mere conceivable

possibility of the other does not. A dispute, maybe. But hardly a genuine one.

The question before Judge Schwait was precisely the question as framed by *Crane v. Scribner*, 369 Md. at 383, 800 A.2d 727:

Whenever an action is filed any significant time after July 1, 1986, and is based upon a disease with a long latency period, as all of the current asbestos-exposure cases are, the predominant question that arises under that statute is when the cause of action "arose."

Cichy was diagnosed with mesothelioma on March 1, 2002. In *Crane v. Scribner*, 369 Md. at 381, 800 A.2d 727, Judge Wilner was discussing the time lapse between the diagnosis of mesothelioma and the first exposure to the cancer-causing agent.

With respect to mesothelioma, Dr. Hammar stated that about 90 to 95% of the cases fall within a 20 to 50 year range, with the average being 30 to 40 years. He explained that carcinogens, such as asbestos, act over many years to cause cellular changes that lead to the development of a malignant cell, and that once a cancer cell, about 10 micrometers in diameter, is formed, it may take 10 to 15, or as many as 30, years for that cell to proliferate and form a tumor the size of a golf ball.

Judge Wilner thoroughly analyzed the three approaches that have been taken in determining when a cause of action based on an asbestos-related injury arises. 369 Md. at 390–93, 800 A.2d 727. In first rejecting the manifestation approach, which looks to the ultimate diagnosis of disease, the Court of Appeals noted that the existence of the injury precedes, perhaps by a considerable period of time, its discernible manifestation.

It is virtually conceded, even by asbestos-action defendants, that *diseases such as cancer and asbestosis exist in the*

*body before they become symptomatic* and before they are capable of clinical diagnosis.

369 Md. at 390, 800 A.2d 727 (emphasis supplied).

*Crane v. Scribner,* 369 Md. at 390, 800 A.2d 727, opted for the exposure approach, which is "the earliest in time and looks to when the plaintiff first inhaled asbestos fibers that caused cellular changes leading to the disease." The opinion spelled out what the plaintiff initially must show.

> We start, then, with *the requisite premise that the plaintiff has established* to the satisfaction of the trier of fact *that he* or she *has an injury that was proximately caused by exposure to the defendant's asbestos-containing product.* Whether the injury sued upon is cancer or asbestosis, *the plaintiff must,* at the outset, *establish that he* or she *has that disease and that it was caused, in whole or substantial part, by exposure to the defendant's asbestos-containing product.* The question, for purposes of § 11–108(b)(1), is when that injury came into existence.

369 Md. at 392, 800 A.2d 727 (emphasis supplied). The Cichy plaintiffs clearly satisfied that first part of the test.

In trying to pinpoint when the cause of action arose, the time of inhalation of the asbestos fibers is the key starting point.

> What the evidence in nearly all of the cases reveals is that, (1) *inhalation of asbestos fibers causes cellular damage,* (2) *the cellular damage occurs shortly after inhalation,* (3) with respect to cancer, the exposure of the cells to asbestos fibers causes the cells to divide, (4) the increased cellular division increases the risk of cellular genetic error, and (5) that, in turn, increases the risk of one or more cells turning cancerous. The evidence establishes, as well, that the greater the exposure, at one time or over time, the greater is the cellular damage, the greater is the chance that the ordinary body defenses will be unable to cope with that damage, and the greater is the likelihood of disease formation. The evidence, viewing the process in hindsight, is that, *if the plaintiff in fact has a disease that he* or she

*establishes is traced to exposure to asbestos, it developed from the cellular damage caused by the asbestos inhalation.* Although it is as impossible to ascertain which fiber ultimately caused which cell, over time, to escape the body's defenses and turn cancerous, as it is to determine when that occurred, *the certainty is that it did occur.* In *Mitchell,* we regarded that *cellular damage, caused by the inhalation of asbestos fibers,* and which later *produced the disease,* as *a bodily injury.*

369 Md. at 392–93, 800 A.2d 727 (emphasis supplied).

For the plaintiff who has ultimately contracted mesothelioma, pinpointing the time of exposure is the most practical and reasonable way to determine the inevitably elusive question of when the cause of action arose.

*Given the practical impossibility of ascertaining with any degree of precision when that onset actually occurred, we consider it* to be *more reasonable to look back to the exposure that ultimately produced the disease,* which cannot, of course, be later than the last exposure, *than to engage in "guesstimates" of when the first cell became diseased,* "guesstimates" based on contradictory expert testimony—the plaintiffs' experts invariably moving the date back and the defendants' experts just as invariably moving it forward—*all of which,* in any event, *seems to be founded upon uncertain assumptions.*

369 Md. at 393, 800 A.2d 727 (emphasis supplied).

In this case, Dr. Edward Gabrielson, professor of pathology and oncology at the Johns Hopkins Medical School, testified as to the likely time lapse between the first damaging exposure and the ultimate manifestation of mesothelioma.

A. And there's good data looking at people who were exposed to asbestos and when they get their cancers, and *that latency period with first exposure until clinical diagnosis of cancer, it is always at least twenty years, almost always twenty.* There are cases of eighteen or nineteen, but almost always twenty years or more. *Typically it is thirty or forty years. It takes a long time.*

Q. And if an individual were exposed to asbestos, say, up until 1985 or 1980 and had never had any other exposure to asbestos, *what asbestos would have caused the cancer?*

A. Well, *it would be these earlier exposures.* In fact, dealing with the situation such as that, which is very common, *we expect exposures prior to 1985 to be the exposures that are causing cancers now twenty years or so later.*

(Emphasis supplied).

The overwhelming likelihood is that Cichy was exposed to the asbestos fibers that caused the first cellular change at some time during the course of his 39 years as a pipefitter at Bethlehem Steel. The suggestion that he suffered no latent injury during all of those 39 years as a pipefitter but only suffered cellular change during his last two or three years on the job, after he had been transferred to the fabrication shop, is speculative to the point of fantasy. That Judge Schwait did not invite the jury to engage in such fantasizing was not an abuse of discretion.

### 4. Evidentiary Issues

Crane's final contention challenges three of Judge Schwait's evidentiary rulings. It claims that Judge Schwait committed error when he 1) permitted expert testimony about crocidolite asbestos and admitted evidence about the presence of crocidolite asbestos in Crane products; 2) permitted expert testimony that Crane products responded to testing in the same manner as did the products of other asbestos manufacturers; and 3) overruled Crane's objection to certain hypothetical questions. As we approach the contention, we note initially that these are evidentiary judgment calls of a type that are ordinarily entrusted to the broad discretion of the trial judge.

### Crocidolite Asbestos

Crane objects that the Cichy plaintiffs should not have been permitted to mention in any way the very word "crocidolite" with respect to a Crane product to which Cichy may have been exposed. It claims that there was no evidentiary predicate for

any inference that any Crane products to which Cichy might have been exposed contained crocidolite. Our short answer is to agree with Judge Schwait that there was such an evidentiary predicate. In responding to this issue in the course of ruling on Crane's post-trial motions, Judge Schwait ruled:

Defendants argue that the introduction of evidence regarding Crocilidate asbestos containing products misled and confused the jury and is a ground to set aside the jury's verdicts and require a new trial.

Based on the video tape deposition of Mr. Cichy, the testimony of Dr. Longo and Dr. Dement (plaintiff's expert witnesses), John Crane's response to Requests for Admissions, Crane's Product catalogue and Crane's packing advertisement dated June 1965, *the evidence was abundantly sufficient for the jury to conclude that Mr. Cichy was exposed to Crane products containing Crocilidate.*

(Emphasis supplied).

■ Even if it were otherwise, however, we can conceive of no possible prejudice. Crane certainly fails to establish any. In 1721 pages of record extract, Crane can come up with a few scattered instances where the word was even mentioned, in passing, in the presence of the jury. In the instances pointed out to us, "crocidolite" was not even the subject of the sentence that contained it, let alone the subject of an elucidating paragraph. The subject of brief discussion, in those scattered instances we can find, was "chrysolite." The basic tenor of the testimony was that chrysolite, while not as potent as crocidolite or amosite, was nonetheless potent enough to cause mesothelioma.

This issue is trivial in the extreme. We cannot picture jurors, poised like dedicated archeologists ready to pounce upon the smallest fossil, waiting eagerly for the softest whisper of the word "crocidolite" and then seizing upon it as if it were the Holy Grail. We are persuaded that the subject did not even dimly pierce the consciousness of the jurors, let alone influence their verdict. It is burdensome to waste scarce judicial resources on such a contention.

## The Process of Fiber Release

One of the concepts that had to be communicated to the jury was the process by which the removal and the installation of gaskets and packing would release asbestos fibers into the surrounding air. To communicate the concept, the plaintiffs utilized the testimony of Dr. James R. Millette and Dr. William Longo, industrial hygienists, who testified as to the general phenomenon of fiber release in the course of such operations. Their conclusions were based upon tests which they had conducted with respect to asbestos-containing gaskets and packing material generically, not specifically with Crane products. Crane protests that the test results should not have been admitted into evidence because the tests were not conducted on Crane products specifically.

It had been established that the Crane gaskets and packing material contained asbestos. Dr. Longo testified with a reasonable degree of scientific certainty that all the gasket companies, including Crane, made the same sort of product for high temperature and high pressured steam lines and that the products of the various manufacturers were comparable to each other and could be used interchangeably. He testified that the same was true of packing material made by various manufacturers and that the packing materials from the different manufacturers would behave in the same way under testing.

Both experts testified that the generic tests were fairly representative of the Crane product. Crane, indeed, had prepared a comparison chart, which listed the gaskets and packing material made by other manufacturers and identified the comparable Crane products which could be used interchangeably with them.

It is important to note that Judge Schwait gave Crane's counsel wide latitude in cross-examining Dr. Longo concerning the similarity or dissimilarity of the asbestos-containing materials. Crane had the opportunity to present evidence, if any existed, that its products were significantly different from the

products of other manufacturers. No such evidence was introduced.

In the post-trial motions, Crane raised this issue in a slightly altered form. In rejecting it, Judge Schwait ruled:

In *ACandS v. Abate,* 121 Md.App. 590, 710 A.2d 944 (1998), Crane raised this issue and it was rejected by the Court of Special Appeals. Here, as in prior cases, there was more than sufficient evidence to establish that Mr. Cichy was exposed to asbestos dust from Crane products.

We see no error.

### Hypothetical Questions

The Cichy plaintiffs presented expert testimony by Dr. Laura Welch and Dr. Edward Gabrielson to show that Crane's products were a substantial contributing factor in the causation of Cichy's mesothelioma. Crane now contends that the hypothetical questions posed to the two experts lacked the required evidentiary basis. The very full response given to this contention by Judge Schwait when it was raised again in post-trial arguments satisfies us that the evidentiary rulings were not in error.

Here the hypothetical questions appear in the trial transcripts at pp 631–638 (Dr. Gabrielson) and pp 1499–1504 (Dr. Welch).

Crane claims that plaintiffs did not offer evidence to prove that Mr. Cichy was exposed to Crane materials containing asbestos and, therefore, the evidence failed to comport to the hypotheticals posed to plaintiffs' experts. *I find that a factual basis existed in the record for each hypothetical question asked.*

The evidence established that *asbestos was used in the type of gaskets and packing with which Mr. Cichy worked from 1950 to 1989.* Longo testimony @ T. p. 1289. *Crane brochures* (Exs. 20, 91, 91A and B and 93) *establish the use of asbestos containing packing and gaskets present in Mr. Cichy's work environment.*

*The Crane catalogue also included the use of asbestos containing products on a steam line around which Mr. Cichy worked.* Mr. Cichy also testified that this work environment over a period of years had dust in it from scraping of gaskets and other activities.

Accordingly, *there was sufficient testimony to form a factual predicate for the jury to consider the hypothetical questions asked.*

(Emphasis supplied). And see *Nolan v. Dillon,* 261 Md. 516, 532, 276 A.2d 36 (1971); *Gordon v. Opalecky,* 152 Md. 536, 548–49, 137 A. 299 (1927).

## II. Puller v. Garlock Sealing Technologies, LLC

For all intents and purposes, the case of Reginald Puller and now the Puller plaintiffs against Garlock Sealing Technologies, LLC has given rise to a completely separate and distinct appeal.

Reginald Puller was for most of his life a resident of Washington, D.C. On his high school graduation day in June of 1969, Puller enlisted in the United States Navy. His first "hitch" in the Navy was one of four years. He served most of that time as a boiler technician aboard the *U.S.S. Hermitage.* Following his discharge from the Navy in 1973, Puller went to work for the National Institute of Health for the two year period of 1973–1975. He worked primarily in the power plant as a boiler technician.

Puller reenlisted in the Navy in 1975 and served through 1978. He worked again as a boiler technician, for that second "hitch" aboard the *U.S.S. Spiegel Grove.* While assigned to the *Spiegel Grove,* Puller also worked on the aircraft carrier *U.S.S. Nimitz,* as it was being built at the Newport News, Virginia, shipyard. During that second period of Navy service, Puller was also assigned to work, for a period of somewhat less than a year, to the Bethlehem Steel Shipyard on Key Highway in Baltimore.

The evidence established that during his service as a boiler technician during both of his tours in the Navy and during his

employment at NIH, Puller was exposed to asbestos-containing gaskets and packing material manufactured by Garlock. Puller was diagnosed with mesothelioma on October 1, 2001. He died of mesothelioma on November 9, 2002.

## 5. Evidentiary Sufficiency of Proof of Economic Loss

Garlock challenges the legal sufficiency of the evidence to support the verdict in favor of the Puller plaintiffs for economic damages. The jury had awarded the plaintiffs $100,000 for the loss of household services and $144,000 for lost wages. Garlock bases its challenge on evidence that Puller may have been addicted to cocaine for some period during the last years of his life.

Garlock's present contention is that Judge Schwait erroneously failed to grant its post-trial motion for 1) a judgment notwithstanding the verdict on this issue, 2) a new trial on the ground that the evidence of economic loss was against the weight of the evidence, or 3) a remittitur on the award for economic loss.

We have gone over with a fine-toothed comb the motion for judgment made by Garlock on May 3, 2004 at the close of the plaintiff's case, and, although three other issues were raised, there was no remote suggestion of the nuanced argument now being made. Similarly, there was no hint of any such argument in the motion for judgment made at the close of the entire case.

Our disposition of the judgment N.O.V. contention, therefore, is a no-brainer. Maryland Rule 2–532(a) is dispositive.

In a jury trial, a party may move for judgment notwithstanding the verdict *only if that party made a motion for judgment at the close of all the evidence and only on the grounds advanced in support of the earlier motion.*

(Emphasis supplied).

Garlock attempts to counter this glaring lapse by pointing to subsection (c):

A motion for judgment notwithstanding the verdict may be joined with a motion for a new trial.

Indeed, it may, if it is otherwise properly in the case. Subsection (c), however, dealing with the formality of the pleading, does not relieve a motion for judgment n.o.v. of the procedural prerequisites and limitations ordinarily attached to it.

Both the granting of a remittitur or the intertwined awarding of a new trial based on the alleged excessiveness of the verdict for economic loss are matters entrusted to the wide discretion of the trial judge. In terms of the width, the virtually boundless width, of "wide discretion," as recently as 1992 *Owens–Illinois v. Zenobia,* 325 Md. 420, 449, 601 A.2d 633, quoted with approval from *Kirkpatrick v. Zimmerman,* 257 Md. 215, 218, 262 A.2d 531 (1970).

"[A]n abuse of that discretion may be reviewed by an appellate court . . . but . . . *'[w]e know of no case where this Court has ever disturbed the exercise of the lower court's discretion in denying a motion for [a] new trial because of the inadequacy or excessiveness of [compensatory] damages.'* "

(Emphasis supplied).

And see *Buck v. Cam's Broadloom Rugs,* 328 Md. 51, 59, 612 A.2d 1294 (1992) ("Because the exercise of discretion under these circumstances depends so heavily upon the unique opportunity the trial judge has to closely observe the entire trial, complete with nuances, inflections, and impressions never to be gained from a cold record, it is a discretion that will rarely, if ever, be disturbed on appeal."); *Banegura v. Taylor,* 312 Md. 609, 624, 541 A.2d 969 (1988); *Conklin v. Schillinger,* 255 Md. 50, 69, 257 A.2d 187 (1969) ("[T]he trial judge should extend the fullest consideration possible to the amount returned by the jury before it concludes that it shocks his conscience, is 'grossly excessive,' or is 'excessive.' "); *State, Use of Shipley v. Walker,* 230 Md. 133, 137, 186 A.2d 472 (1962) ("It is well settled that the granting or refusal of a new trial, conditional or otherwise, is not reviewable except under extraordinary circumstances."); *Darcars v. Borzym,* 150 Md.

App. 18, 78–83, 818 A.2d 1159 (2003); *Owens–Illinois v. Hunter*, 162 Md.App. 385, 414–16, 875 A.2d 157 (2005).

In pointing out not simply the deference owed by the appellate court to the trial judge but the deference owed by the trial judge, in turn, to the verdict of the jury, *Buck v. Cam's Rugs*, 328 Md. at 59–60, 612 A.2d 1294, quoted with approval from *Boscia v. Massaro*, 365 Pa.Super. 271, 529 A.2d 504, 508 (1987):

> [A] jury's verdict should not be casually overturned. In our system of justice, the jury is sacrosanct and its importance is unquestioned. *The members of a jury see and hear the witnesses as they testify. They watch them as they sweat, stutter, or swagger under the pressure of cross-examination. This enables the jury to develop a feel for the case and its personal dynamics which cannot be conveyed by the cold printed page of a record reproduced for appellate review.* ... We must afford *the judge* great discretion in making this decision because he *too is present in the courtroom as the evidence is presented. As does the jury, he develops a feel for the human pulse of the case.* In short, our seemingly simple decision to uphold the grant of a new trial is actually the end result of a highly complex process involving the interaction of judge, jury, and attorneys. This process has developed over centuries and its complicated dynamics belie its surface simplicity. However, *the greatest tribute to its success is probably the extent to which we take it for granted as the ultimate guarantor of justice.*

(Emphasis supplied).

In ruling on this argument as it arose in the course of the hearing on the post-trial motions, Judge Schwait ruled:

> Based on the testimony of the Pullers, the jury could have (and obviously did) determine that Mr. Puller's income was not (and would not have been in the future) impacted by his alleged addictions. *This factual inquiry is totally within the province of the jury and should not be disturbed.*

(Emphasis supplied). Seeing no abuse of discretion, we affirm that ruling.

### 6. Consortium With and Without Benefit of Clergy

Among the verdicts in the Puller case was one in which the jury found that there had been damage to the marital relationship between Reginald and Olivia Puller, to wit, a loss of consortium. The jury awarded $2,000,000 to Mrs. Puller. Garlock contends that Judge Schwait erroneously failed to rule, as a matter of law, that Olivia Taylor Puller was not the legal wife of Puller at the time he filed his claim and that that verdict was, therefore, invalid. Garlock frames the contention as follows:

> *The Trial Court erred by failing to grant Garlock's* Motions for Judgment and/or *Motion to Dismiss Olivia Taylor's Claim* and/or Motion in Limine to Exclude Certain Testimony of Olivia Taylor *based upon the fact that she was not legally married to Reginald Puller at the time Mr. Puller filed his claim.*

(Emphasis supplied).

The issue was whether Reginald Puller and Olivia Taylor Puller had, in fact, entered into a common-law marriage in the District of Columbia. Judge Schwait submitted that issue to the jury and the jury found that the parties had, indeed, entered into such a marriage.

> Do you find by a preponderance of the evidence that Olivia Taylor Puller and Reginald Puller had entered into a common-law marriage prior to the diagnosis of Mr. Puller's mesothelioma?
>
> Yes √ No ____

Garlock now argues that this issue should not have been submitted to the jury and that Judge Schwait should have ruled, as a matter of law, that no valid marriage had ever taken place.

Except for his hitches in the Navy, Puller lived his entire life in Washington, D.C. He was first married, in Washington, to Brenda Mendenhal in 1973. They were divorced in 1981. David Puller, the personal representative of Puller's estate and Puller's only surviving child, was born of that marriage.

Olivia Taylor Puller had first been married in Mississippi in 1964 and was later divorced. She also lived for a time in Memphis, Tennessee. When she came to Washington in the early 1980's, she had four children. She met Puller in Washington on New Year's Eve of 1984, at a time when they were both divorced. They began living together in 1985 and lived together continuously until Puller's death on November 9, 2002. Reginald Puller and Olivia Taylor Puller went through a formal marriage ceremony in Virginia on February 4, 2002. Ms. Puller maintained, however, and the jury so found, that she and Reginald Puller had, in fact, been husband and wife since 1985 as a result of a common law marriage in the District of Columbia.

This suit, of course, was brought and prosecuted to its conclusion in Maryland. Garlock's present contention will be assessed in terms of the marital status of Reginald and Olivia Puller as recognized by Maryland law. How, then, does the Maryland law look upon the institution of common law marriage, both here and abroad?

### The Primness of Maryland's Marriage Law At Home

For over half a century, the accepted fountainhead of wisdom as to Maryland's official attitude toward the institution of common law marriage, both when informally practiced here and when formally celebrated abroad, has been thought to be the opinion of the Court of Appeals in *Henderson v. Henderson*, 199 Md. 449, 87 A.2d 403 (1952). In truth, however, the *Henderson v. Henderson* discussion was little more than a latter-day restatement of the truly pioneering analysis made by Judge Alvey 80 years earlier in *Denison v. Denison*, 35 Md. 361 (1872).

The bottom line of the *Denison* decision was that Maryland does not recognize, and never has recognized, the institution of common law marriage as a legally cognizable relationship in this State. Judge Alvey characterized what was then before the Court of Appeals as a "question[ ] of great and most delicate interest to society, and which would seem to be presented for the first time for direct adjudication in this

State." 35 Md. at 370. Georgeana Denison alleged herself to have been the lawful wife of her intestate husband, thereby entitled to one-half of his estate. The Court of Appeals summarized her not insignificant evidence in that regard.

*It is not pretended that there was ever any solemnization of marriage between the appellee and the deceased;* but it is alleged by the appellee, that *from the 17th of January, 1863,* until the death of the intestate, *he and she were husband and wife, they having mutually agreed* from that time thenceforth *to be and regard each other as such.* That, in pursuance of such agreement, *they cohabited and lived together as man and wife;* that *the appellee was maintained and supported by the deceased,* up to the time of his death, *as his wife;* and that *they both acknowledged, recognized and acted towards each other in all things, as husband and wife, and were known, treated and reputed to be such, among their friends and acquaintances.*

35 Md. at 370–71 (emphasis supplied).

The Orphans' Court was persuaded by that proof and ruled that the couple had, indeed, been "lawfully married." *Id.* The Court of Appeals, however, reversed. It disdained non-solemnized "marriages" as "wanton and licentious cohabitation."

So far as we are informed, *this is the first instance in which a marriage contract of the nature of the one here set up,* alleged to have been made in this State, *has ever been attempted to be maintained as constituting a valid marriage,* in any of our courts. *These loose and irregular contracts,* as a general thing, *derive no support from morals or religion, but are* most generally *founded in a wanton and licentious cohabitation.* Hence *the law of the State has given them no sanction.*

35 Md. at 380–81 (emphasis supplied).

What is required for a marriage to be lawfully entered into in Maryland, said the Court, is some form of ceremony whereat some authorized person, ecclesiastical or governmental, officially celebrates the marriage.

[W]e think we are safe in saying that *there never has been a time in the history of the State,* whether before its independence of Great Britain or since, *when some ceremony or celebration was not deemed necessary to a valid marriage.* In the early days of the province it was not absolutely necessary that a minister of religion should officiate—a judge or a magistrate could perform the ceremony—but still, *in all cases, some formal celebration was required.*

35 Md. at 379 (emphasis supplied).

It is not enough that an oral contract of marriage is entered into by the parties. Such a contract must be further solemnized by an authorized ecclesiastical or governmental official.

It is true, the Act contains no express prohibition or declaration of absolute nullity of marriages contracted *per verba de prasenti;* but it is plainly to be perceived that *such marriages, if allowed, would contravene the spirit and policy of the Act. The implications* from the provisions of the Act *are exceedingly strong against such marriages,* and the practice and custom of the people of the State have been so universally in conformity with what would appear to have been the policy and requirement of the law, that such custom has acquired the force and sanction of law, even though a question could be made as to the technical construction of the Act itself. Besides, as we have seen, *an unsolemnized contract of marriage,* at the common law, *is inchoate merely, or incomplete, being ineffectual to confer many of the most important rights of the matrimonial state,* and *to supply the defect of solemnization, positive law was required. Such positive law has never been provided,* and consequently a marriage contracted in this State merely *per verba de prasenti,* or *per verba de futuro cum copula,* has no sanction in our law, whatever may be the law upon this subject elsewhere.

35 Md. at 380 (emphasis supplied).

At the time of *Feehley v. Feehley,* 129 Md. 565, 99 A. 663 (1916), the only form of solemnization statutorily authorized was a religious ceremony. Although that limitation is now

outdated, since ch. 406 of the Acts of 1963 added court clerks and deputy clerks to the list and ch. 207 of the Acts of 2002 added judges to the list, the *Feehley* opinion nonetheless makes it clear that some ceremonial solemnization is a required feature of a valid Maryland marriage.

It is the settled law of this State that *"some* religious *ceremony" must be "superadded to the civil contract" in order that a marriage may be valid.* ... Upon the evidence in the Record before us there can be no doubt that *there was a ceremony in connection with the event now under inquiry,* and that it was religious in its character. It was conducted by a duly ordained minister in the formal exercise of his sacred office. *It was unquestionably intended to be an essential feature of the new marital agreement* into which the parties were entering.

129 Md. at 568, 99 A. 663 (emphasis supplied). See also *Mitchell v. Frederick,* 166 Md. 42, 46, 170 A. 733 (1934); *Townsend v. Morgan,* 192 Md. 168, 173, 63 A.2d 743 (1949).

The opinion of Judge Delaplaine in *Henderson v. Henderson,* 199 Md. at 454, 87 A.2d 403, picked up on the ceremonial or solemnization requirement, as it quoted from *Denison,* 35 Md. at 378.

Unless there be something in the law of this State, apart from the common law of England, to render such contracts valid without solemnization, it follows, necessarily, that they can, at most, only be valid to the extent that they are good at the common law without solemnization, and, as we have seen, *such unsolemnized contracts are incomplete, and are not effectual to confer legitimacy upon the issue, nor the rights of property upon the parties,* a right that is attempted to be enforced in this case.

*The law in Maryland had thus long been established that a common-law marriage is not valid.*

(Emphasis supplied).

The Court of Special Appeals, speaking through Chief Judge Gilbert, added its voice to the chorus in *Goldin v. Goldin,* 48 Md.App. 154, 157–58, 426 A.2d 410 (1981).

Absent a showing that the "marriage" was valid where performed, *no amount of holding out as husband and wife, reputation as being husband and wife, number of children, or any other factor will transpose the living together of a man and woman into a legal marriage in this State. Marriage does not take place simply because a man and woman cohabit for a protracted period of time.*

Marriages in Maryland are controlled and regulated by Md. Ann.Code art. 62. *Prior to Laws 1963,* ch. 406, *no valid marriage could be performed in this State without some sort of religious ceremony. Denison v. Denison,* 35 Md. 361 (1872). *By the 1963 act, clerks or deputy clerks,* designated by the resident circuit court judges *were permitted to perform marriages.*

(Emphasis supplied).

The ceremonial requirement and the list of officials authorized to preside over the marriage ceremony are now spelled out in Maryland Code, Family Law Article, § 2–406.

### The Indulgence of Maryland As It Assesses Common Law Marriages Abroad

As insistent as Maryland continues to be, however, about the solemnizing prerequisite of a marriage ceremony or celebration within the State, it nonetheless looks, largely in the interest of interstate comity, with benign indulgence on common law marriages when they are entered into and recognized beyond our borders. The *Henderson v. Henderson* case was a pioneer in that regard.

We accept the general rule that *a marriage valid where contracted or solemnized is valid everywhere.* The reason for this rule is that *it is desirable that there should be uniformity in the recognition of the marital status,* so that *persons legally married according to the laws of one State will not be held to be living in adultery in another State,* and that *children begotten in lawful wedlock in one State will not be held illegitimate in another.*

**60**

199 Md. at 458, 87 A.2d 403 (emphasis supplied). Judge Delaplaine further explained:

> The statutory provisions for solemnization of marriages relate to form and ceremony and do not cause a marriage which has been entered into in some other jurisdiction to fall within the exception to the general rule that a marriage valid where contracted or solemnized is valid everywhere. We have adopted the generally accepted rule that where a valid common-law marriage has been entered into in a jurisdiction which recognizes the validity of such a marriage, it will be recognized as valid in another jurisdiction, regardless of the rule which prevails in the latter jurisdiction in respect to the validity of common-law marriages.

199 Md. at 459, 87 A.2d 403 (emphasis supplied).

For present purposes, it is pertinent to note that the out-of-state common law marriage recognized by the *Henderson* decision was one entered into in the District of Columbia.

*Goldin v. Goldin*, 48 Md.App. at 157, 426 A.2d 410, also spoke to the same effect.

> Maryland has consistently held that a common-law marriage, valid where contracted, is recognized in this State.

And see *Laccetti v. Laccetti*, 245 Md. 97, 101, 225 A.2d 266 (1967) ("Common-law marriages are recognized in the District of Columbia. . . . We have adopted the generally accepted rule that where a valid common-law marriage has been entered into in a jurisdiction which recognizes the validity of such a marriage, it will be recognized as valid in another jurisdiction."); *Bannister v. Bannister*, 181 Md. 177, 180, 29 A.2d 287 (1942); *Marshall v. Stefanides*, 17 Md.App. 364, 371, 302 A.2d 682 (1973).

Although adamantly insisting upon the ceremonial niceties for contracting a marriage in Maryland, our law will, when the occasion demands, bend over backward to find a way around the ceremonial breach. A classic exemplar of that redemptive urge was *Blaw–Knox Construction Equipment Co. v. Morris*, 88 Md.App. 655, 596 A.2d 679 (1991). The plaintiff there sought to recover damages for the wrongful death of her

"husband." The defendant manufacturer countered that the plaintiff and the deceased had never been legally married.

The evidence showed that Mr. and Mrs. Morris had lived monogamously together in Maryland, without ever having been separated, for 38 years. They held themselves out to the world as husband and wife. They had six children, all of whom believed their parents to be married. That belief was shared by other relatives, neighbors, and doctors. Mr. and Mrs. Morris celebrated their wedding anniversary each year on October 5. Mrs. Morris wore the wedding ring Mr. Morris had given her. Mrs. Morris had never worked outside the home but stayed at home to raise the children and keep house. She was known to the world as "Mrs. Rita Morris." Mr. and Mrs. Morris filed joint tax returns. She was listed as his wife on his life insurance policy. The defendant nonetheless meanly maintained that, for lack of a formal wedding ceremony, Mrs. Morris was not, in the eyes of the law, a "surviving spouse."

Thus was posed an interesting problem for the Court of Special Appeals. When there is a will, however, there is a way. The opinion of the Court cited the indisputably controlling law, in both its foreclosing and its redeeming aspects.

> *Maryland courts do not recognize common law marriages contracted within this state's geographic boundaries.* They have continuously held, *however,* that *a marriage "valid where contracted, is recognized in this State."*

88 Md.App. at 669, 596 A.2d 679 (emphasis supplied).

By a stroke of good fortune, Mr. and Mrs. Morris had, eight years before Mr. Morris's death, interrupted their 38–year life together in Maryland with a two-day trip to Pennsylvania, a state that at that time recognized the institution of common-law marriage. Judge Motz's opinion described that windfall of grace.

> In 1983, *Mr. and Mrs. Morris went to Pennsylvania* to attend the funeral of Mr. Morris' brother. *They spent two nights, alone, in a motel in Pennsylvania. Mrs. Morris met a number of members of Mr. Morris' family who*

*greeted and treated her as his wife.* By the time this trip took place, Mr. and Mrs. Morris had been living together and holding themselves out as husband and wife for more than thirty (30) years. *Pennsylvania does recognize common law marriages* contracted in that state. Accordingly, *Mrs. Morris claims that* by virtue of this 1983 trip, *she and Mr. Morris entered into a common law marriage in Pennsylvania.*

88 Md.App. at 670, 596 A.2d 679 (emphasis supplied).

After citing appropriate authorities to show that Pennsylvania did, indeed, recognize common-law marriages, this Court concluded that Mr. and Mrs. Morris had entered into such a common-law marriage during their brief sojourn in Pennsylvania.

[W]e conclude that *there was sufficient evidence of a Pennsylvania common law marriage to create a jury question.* Although the Morris' stay in Pennsylvania was certainly brief, *Mrs. Morris did present evidence of reputation in Pennsylvania, i.e.* holding themselves out as husband and wife to all the Pennsylvania friends and relatives *and cohabitation in Pennsylvania, i.e. the two nights in the Pennsylvania motel.*

88 Md.App. at 671, 596 A.2d 679 (emphasis supplied).

It is inconceivable that our result would have been different if Mr. and Mrs. Morris had spent only a single night, instead of two, in that Pennsylvania motel. The opinion, 88 Md.App. at 671–72, 596 A.2d 679, quoted with approval from *Henderson v. Henderson,* 199 Md. at 458, 87 A.2d 403, as it, in turn, quoted with approval from 1 Bishop, *Marriage, Divorce & Separation,* § 975:

[T]he living together of marriageable parties a single day as married, they meaning marriage and the law requiring only mutual consent, makes them husband and wife.

Even the element of "reputation in Pennsylvania" may not be an irreducable *sine qua non,* as our opinion, 88 Md.App. at 672, 596 A.2d 679, quoted with approval a New York State opinion.

We note that in *McCullon v. McCullon*, 96 Misc.2d 962, 410 N.Y.S.2d 226 (Sup.Ct.1978), a New York court applied Pennsylvania law, to hold that *yearly visits to Pennsylvania, without any evidence as to reputation in Pennsylvania, together with the couple's cohabitation and reputation in New York, was sufficient to establish a common law marriage under Pennsylvania law. Id.* 410 N.Y.S.2d at 227–28.

(Emphasis supplied).

Nor did we seem to read the Pennsylvania law as requiring proof of "words in the present tense" indicating an intention of entering into a marriage contract in the course of the visit, as we also quoted with approval, 88 Md.App. at 672, 596 A.2d 679, from a Second Circuit decision.

*See also, Renshaw v. Heckler*, 787 F.2d 50, 53 (2d Cir.1986) (applying Pennsylvania law) (*although woman "furnished no proof of words in the present tense establishing a marriage contract in Pennsylvania*, she did present proof of cohabitation and reputation. The Renshaws' stays in Pennsylvania were admittedly short; but they cohabitated during the entire time they were there ... they held themselves out as husband and wife to every individual they knew that they saw in Pennsylvania ...").

(Emphasis supplied).

We need not consider and, therefore, we intimate nothing as to what we think the result might have been had Mr. and Mrs. Morris only made a day trip to Pennsylvania or, perhaps, only flown over Pennsylvania on their way to someplace else. On the occasion of our decision in *Blaw–Knox v. Morris*, however, the dice were unquestionably hot.

### Common–Law Marriage in D.C.

Both *Henderson v. Henderson*, 199 Md. at 456, 87 A.2d 403, and *Laccetti v. Laccetti*, 245 Md. at 101, 225 A.2d 266, stated unequivocally that "Common-law marriages are recognized in the District of Columbia." The correctness of those statements is immediately born out by an examination of the D.C.

caselaw. The issue was first considered by the Court of Appeals of the District of Columbia in *Hoage v. Murch Brothers Construction Co.*, 60 App. D.C. 218, 219, 50 F.2d 983, 984 (1931) ("We come, therefore, to consider whether or not a common-law marriage is valid in the District of Columbia.").

Recognizing that the District had been carved out of Maryland and that Maryland's version of the state of the prevailing law at the time of the district's separation was controlling precedent, the *Hoage* court turned to supervening acts of Congress to get itself out from under the otherwise controlling precedent of *Denison v. Denison, supra.*

> The fact remains that *Congress has enacted* a complete set of *divorce and marriage laws* for the District of Columbia, and *it is to these laws, rather than to those preserved out of the past relationship with the state of Maryland, that we must look* for guidance and control in the determination of the question now before us, and hence *we do not think we can safely follow the decision of the Court of Appeals of Maryland in Denison v. Denison, supra,* in which it was held that under the Maryland marriage Act of 1777, to constitute a lawful marriage, there must be superadded to the civil contract, some religious ceremony, for this is not true under the marriage laws of the district.

50 F.2d at 984 (emphasis supplied).

After thoroughly surveying both English common law and ecclesiastical canon law, the D.C. Court of Appeals concluded that common-law marriages were valid unless some statute expressly nullified them.

> We think, therefore, that it cannot now be controverted that *an agreement between a man and woman* per verba de praesenti *to be husband and wife, consummated by cohabitation as husband and wife, constitutes a valid marriage, unless there be* in existence in the state in which the agreement is made *a statute declaring the marriage to be invalid unless solemnized in a prescribed manner,* and we think it equally true that the rule now generally recognized is that *statutes* requiring a marriage to be preceded by a

license, or to be solemnized by a religious ceremony, *without express words of nullity as to marriages contracted otherwise, are directory merely,* and *failure* to procure the license or *to go through a religious ceremony does not invalidate the marriage.*

*Id.* at 985 (emphasis supplied).

Finding no such express nullification or invalidation in the Acts of Congress dealing with marriage ceremonies, the Court of Appeals declared that common-law marriages in the District of Columbia are valid.

*There is nothing in the statute which declares that a marriage shall not be valid unless solemnized in the prescribed manner,* nor does it declare any particular thing requisite to the validity of the marriage. The act confines itself wholly with providing the mode of solemnizing the marriage and to the persons authorized to perform the ceremony. Indeed, the statute itself declares the purpose underlying the requirements to be to secure registration and evidences of the marriages rather than to deny validity to marriages not performed according to its terms, and, since *the legislative intent to abrogate the common-law right may not be presumed, unless clearly expressed (Meister v. Moore, supra),* [96 U.S. (6 Otto) 76, 24 L.Ed. 826 (1877)] we are necessarily brought to conclude that *the decision of the lower court that common-law marriages in the District are invalid is not supported by law, and is wrong.*

*Id.* at 985–86 (emphasis supplied).

The subsequent caselaw accepts the 1931 decision in *Hoage v. Murch Bros.* as binding authority and begins to hammer out supporting law dealing with the proof of common-law marriage. *United States Fidelity & Guaranty Co. v. Britton,* 106 U.S.App.D.C. 58, 269 F.2d 249 (D.C.Cir.1959), focused on the mutual agreement of the parties, in the present tense, to enter into a state of matrimony.

*An agreement between a man and woman per verba de praesenti to be husband and wife, consummated by cohabi-*

*tation as husband and wife, constitutes a valid marriage* * * *. This assumes, of course, that both parties are legally and physically capable of entering into the marriage relationship. So, whatever the rule may be elsewhere, *in the District of Columbia it is that when a man and woman* who are legally capable of entering into the marriage relation *mutually agree, in words of the present tense, to be husband and wife, and consummate their agreement by cohabiting as husband and wife, a common-law marriage results.*

269 F.2d at 251 (emphasis supplied).

In that case, there was no probative evidence of such a present-tense agreement to marry and there was, therefore, no common-law marriage.

As both were legally free to marry had they chosen to take that step, and *as mutual consent or agreement was admittedly lacking, their cohabitation was meretricious* at its outset in 1945 and continued so at least until October 10, 1952. *Cohabitation which was meretricious in its inception is considered to have the same character throughout its continuance* after the removal of a real or supposed impediment. *Cohabitation continued thereafter could not ripen into a common-law marriage unless it was pursuant to a mutual consent or agreement to become husband and wife* made after the removal of what she supposed was a barrier.

*Id.* at 253–54 (emphasis supplied).

In *National Union Fire Insurance Co. v. Britton,* 187 F.Supp. 359 (1960), the District Court provided a helpful set of definitions, contrasting "ceremonial marriage" and "common-law marriage."

The words "common-law marriage" have at times been used somewhat loosely and, therefore, it seems appropriate to revert to a definition of the term. *A marriage may be contracted in either of two ways:* either *by a ceremony witnessed by a minister of religion or by a civil officer authorized by law to do so,* in which event *it is denominated a ceremonial marriage;* or *by an agreement between a man*

*and a woman to marry each other* and to become husband and wife, as of the time of the consent, *in which event the marriage is know as a common-law marriage. Both types of marriages are equally lawful, solemn, and binding.*
187 F.Supp. at 363 (emphasis supplied).

The deceased and the plaintiff in that case had initially lived together in Virginia, but Virginia does not recognize common-law marriages. That impediment was removed, however, when the couple moved to the District of Columbia, and the initial agreement to be married, albeit invalid when and where made, ripened into a legally binding agreement with the couple's arrival in the District.

Consequently *the agreement to become husband and wife was not effective, when made,* since the Virginia law created an impediment to the creation of such a marriage relation. *In 1946 the couple moved to Washington, where they continued living together for about ten years.* The District of Columbia recognizes common-law marriages. Consequently, *the impediment to the inception of the marriage was removed* and since the relation continued pursuant to the agreement entered into previously, *a common-law marriage was created as soon as the couple moved to the District of Columbia and continued living there.*
187 F.Supp. at 364 (emphasis supplied).

In *Matthews v. Britton,* 112 U.S.App.D.C. 397, 303 F.2d 408 (1962), the Court of Appeals for the District of Columbia Circuit made it clear that if a couple express their mutual intent to be married even when knowing of a legal impediment to the marriage and that impediment is subsequently removed, their arrangement will ripen into a common-law marriage and it is not necessary for them to repeat or to renew the agreement.

*[A]s long as the impediment* of Ernestine's lawful marriage to Johnson *existed, she and Henry Matthews could not lawfully be or become husband and wife.* However, it is settled that if parties agree to be husband and wife in ignorance [of] an impediment to lawful matrimony, then *the*

*removal of that impediment results in a common-law marriage between the parties if they have continued to cohabit and live together as husband and wife.* Similarly, this Court has held *the same result obtains even if the parties have knowledge of the impediment* at the time that they agree to be married. *It is not to be expected that parties once having agreed to be married will deem it necessary to agree to do so again when* an earlier marriage is terminated or *some* other *bar to union is eliminated.*

303 F.2d at 409 (emphasis supplied).

In *Marcus v. Director,* 179 U.S.App. D.C. 89, 548 F.2d 1044 (1976), on the other hand, a petitioner was denied death benefits after an administrative law judge found that his relationship with a deceased woman was only meretricious cohabitation and not a common-law marriage. In affirming the decision of the administrative law judge, the Court of Appeals stressed the deference that is due to the *nisi prius* fact finder.

*Such an agreement may* at times *be proved by either direct or circumstantial evidence,* but where available, *the testimony of the parties is naturally preferred.* Here petitioner was available and actually did testify, as did various relatives and acquaintances of the two individuals. Petitioner's testimony, however, even when viewed most favorably, could only be characterized as ambiguous, and the ALJ specifically found that it was "sorely lacking in credibility" and that if any agreement at all "could possibly be found through his testimony, it would not be worthy of belief." *The ALJ observed petitioner's demeanor at the hearing, as we did not, and it was for him to judge the credibility of any testimony and to weigh the evidence adduced therefrom.*

548 F.2d at 1048–49 (emphasis supplied).

In *East v. East,* 536 A.2d 1103 (D.C.App.1988), the appellee argued that she and the appellant had entered into a mutual agreement to be married. The appellant denied that there had ever been such an agreement. The D.C. Court of Appeals

affirmed the fact-finding of the trial judge, by a preponderance of the evidence, that such an agreement had, in fact, been entered into and that a common-law marriage between the parties existed.

> *The trial court found that there was a present verbal agreement to be married* on October 31, 1977. In the "Findings of Fact" section of its order, the court recited the contradictory evidence concerning that agreement, and in its "Conclusions of Law" *the court resolved this conflict in favor of Margaret East. Thus it must be affirmed unless appellant can persuade us that it is plainly wrong or without evidence to support it. Appellant has not made such a showing. The trial court had to weigh conflicting testimony in making this crucial finding.* Margaret said that Paul, with her agreement, announced they were married "from here on in," whereas Paul said that Margaret, over his objection, told of a marriage ceremony that actually had not taken place. *With evidence on both sides of the issue, the trial court's judgment as to the credibility of the witnesses and the strength of the evidence may not be disturbed.*

*Id.* at 1106 (emphasis supplied).

In *Coates v. Watts,* 622 A.2d 25 (D.C.App.1993), the plaintiff, fighting with others over the decedent's property, sought to establish that he had been her common-law husband. The trial judge, essentially because of the lack of an agreement to be married, was not persuaded that the alleged common-law marriage ever existed. The D.C. Court of Appeals affirmed.

> *[W]hen one of the parties* to the alleged marriage *asserts its existence but either denies or fails to say there was mutual consent or agreement,* then *mere cohabitation, even though followed by reputation, will not justify an inference of mutual consent or agreement to be married.* Although there is no set formula required for the agreement, the exchange of words must "inescapably and unambiguously impl[y] that an agreement was being entered into to become man and wife as of the time of the mutual consent."

*Coates' testimony,* if credited, *established at most that he and Ms. McCall had,* by the end of her life, *agreed to be married at an unspecified future time.* In light of the authorities cited, *this is insufficient to establish the existence of a common law marriage,* and the trial judge correctly so held.

*Id.* at 27 (emphasis supplied).

In stressing the parity between a common-law marriage and a ceremonial marriage, *Dickey v. Office of Personnel Management,* 419 F.3d 1336 (C.A.Fed.2005), the Circuit Court of Appeals for the District of Columbia pointed out that "although formation of a common-law marriage is notoriously simple under the laws of the District of Columbia, dissolution is relatively difficult."

Once a common-law marriage has been established, it can only be terminated by death or by a divorce decree.

*Id.* at 1341.

### The Common–Law Marriage in This Case

■ It is that body of law that we must now apply to the facts of the Puller relationship in this case. It was not required, of course, for Mrs. Puller to have presented a compelling case for her common-law marriage, although we are not, by saying that, intimating that her case was not a solid one. All she was legally required to do was to satisfy the more minimal burden of production necessary to generate a genuine issue of fact. We fully agree with Garlock that Mrs. Puller, as the proponent of the common-law marriage, bore the burden of persuasion on that issue. She obviously carried that burden successfully, however, for the jury was persuaded.

■ It is Garlock that must swim upstream on this contention. It is Garlock that must persuade us that the evidence was so overwhelmingly one-sided against the existence of a common-law marriage that no genuine dispute of fact was even generated and that Judge Schwait should, as a matter of law, have removed the issue from the jury's consideration. It has not done so.

In terms of the warm domestic glow radiating from every pore of Mrs. Puller's evidence, *Blaw–Knox Construction v. Morris*, 88 Md.App. at 671, 596 A.2d 679, provides the supportive ambience.

Blaw–Knox claims that Mrs. Morris failed to present sufficient evidence of a Pennsylvania common law marriage to create a jury question, and so its motion for judgment on this point should have been granted. It has been long-established that in order *to determine the legal sufficiency of evidence it is necessary to assume the truth of all the evidence offered on the point in issue and add thereto every inference which may be fairly and legitimately drawn from it by a jury in the exercise of reasonable intelligence.* (Emphasis supplied).

Garlock seizes upon the fact that the Pullers went through a formal wedding ceremony in Virginia in 2002 as conclusive evidence that they, therefore, must have considered themselves not to be man and wife prior to that time. Although it made reference to a few other factors, this was the unquestioned centerpiece of Garlock's case: "If Mr. Puller and Ms. Taylor had been living under the impression that they were in a mutually agreed upon marital relationship, . . . they [would not] have found it necessary to solemnize the relationship via a civil ceremony." We find that position to be unduly simplistic.

Discussion pro and con about a formal marriage ceremony is by no means dispositive as to the antecedent existence of a marriage informally entered into. Such a ceremony may, of course, mark the pivotal transition from an unwed to a married state. Such a ceremony, on the other hand, might simply represent a desirable "upgrade" in social status and official acceptability. Just because a common-law marriage is legal does not guarantee that it may not be frowned upon by one's social peers or skeptically questioned by bureaucratic officialdom. For a variety of reasons, partners in a common-law marriage may seek the additional advantages of an official ceremonial imprimatur. "Let's put those whispers to rest." Even an already "honorable woman" may feel more honorable

when she walks down the aisle to the accompaniment of Felix Mendelssohn. *Blaw–Knox v. Morris* is again instructive.

Blaw–Knox's claim rests upon the single fact that *Mrs. Morris testified that Mr. Morris "kept telling me he was gonna marry me." Blaw–Knox asserts,* and argued to the jury, *that this necessarily refutes any present intention by Mr. and Mrs. Morris to be married. That is certainly plausible. The jury, however, was entitled to conclude that,* in light of all the other evidence, *this testimony by Mrs. Morris,* who was not sophisticated or a lawyer, *simply meant that Mr. Morris kept telling her that in the future they would have a formal marriage ceremony* before a minister or justice of the peace, *not that it indicated that they were not yet married in any sense.*

88 Md.App. at 671 n. 9, 596 A.2d 679 (emphasis supplied).

▪ Garlock, moreover, needs reminding of what happens on review when an arguably ambiguous predicate, such as the 2002 wedding ceremony in Virginia, permits of contradictory inferences. The universally recognized standard of appellate review is that the appellate court, when assessing the legal sufficiency of the evidence on an issue, as we are asked to do here, will accept as true that version of the evidence most favorable to the prevailing party, and only that version. The prevailing party here, of course, was Ms. Puller.

The drawing of the inference adverse to a preexisting marriage was a perfectly legitimate option for Garlock to have urged upon the jury. It was a strong talking point. At this very different stage of the proceedings, however, such an adverse inference is no longer available and has no business even being mentioned. It was a part of a version of the evidence more favorable to Garlock. It is, therefore, something that we are enjoined, in assessing legal sufficiency, totally to ignore. Our perception must be that the glass is half full rather than half empty or, at least, that some rational fact finders might have seen it that way.

David Puller testified as to his perception of the relationship between his father and Olivia Taylor Puller.

Q. Had they been living together continuously?

A. Yes.

Q. *When you would visit your dad with Mrs. Puller, how did they act together?*

A. *As any other married couple.* Pretty much just like a married couple. They had good times; they had bad times. They argued; they got on each other's nerves. My father would call me sometimes and say Olivia is getting on my nerves. I can't take this. But for the most part they acted very well together.

Q. And was that from 1990 on whenever you would go and visit?

A. Yes. Since the first time I met her.

Q. How often would you see them from 1990 until the time that your dad passed away?

A. In the early '90s I would see him like once a month, and as the '90s progressed, I would see them more often.

(Emphasis supplied).

David Puller described how Olivia Puller's four grandchildren lived with and were raised by Mr. and Mrs. Puller.

Q. And what did your dad consider these grandchildren to be?

A. He considered them as his own. His grandchildren were not biologically his, but *Olivia was his wife, so he accepted Olivia as his wife.*

(Emphasis supplied).

Mrs. Puller testified that, after meeting on New Year's Eve of 1984, she and Reginald Puller began living together in March of 1985 and continued to live together continuously for the next 17 years. Both parties considered themselves to be married.

Q Now, *before you got formally married in Virginia, what did you consider your relationship with Mr. Puller to be?*

A *He was my husband.*

Q And did you live in Washington D.C. during that time?

A All of the time.

Q *Did you and Mr. Puller* before February of 2002 ever over the years from 1985 on *ever talk about getting married at a marriage ceremony?*

A *Yes, we did.*

Q And what, if any, response or what was the conversation about?

A Well, *the conversation was like we would go to other weddings, and he would say we already married, we common law married.* We lived in D.C. for five years, and *in D.C. after five years you are common law married.*

Q You are saying the word common law married, is that what you are saying?

A Yes.

(Emphasis supplied).

She described how the couple had a joint checking account to pay the household bills, the checks listing both names (hers as "Olivia Taylor") but bearing the single address of the marital abode.

Q Okay. And did you ever have a banking or checking account together?

A Yeah, *we had a joint account to pay the bills.* My part of the money would go into the joint account and his, too, then we had our private and separate accounts.

Q Can you tell the ladies and gentlemen of the jury, this old checkbook, *who are the two people listed on those checks?*

A *Olivia Taylor and Reginald E. Puller.*

Q *And was that the address where the two of you lived?*

A *Yes, that's our address.*

(Emphasis supplied).

For 15 years, Mr. and Mrs. Puller celebrated their wedding anniversary every New Year's Eve.

Q Ma'am, after you and Mr. Puller met in 1984 and met on New Year's Eve, did the two of you ever celebrate that meeting over the years?

A *For the next 15 years we did on New Year's Eve.*

Q And what did you consider that to be?

A Well, the kids knew that we met that day. They knew, *everybody that knew us knew that was our anniversary day.* So we'd invite friends over for, you know, it was New Year's Eve, and to hold the celebration together.

Q And *did you consider that your anniversary?*

A *That was our anniversary.*

(Emphasis supplied).

When Mr. and Mrs. Puller purchased a home in 1998, the property was titled in their joint names as husband and wife.

Q Did there come a point in 1998 where you and Mr. Puller bought a house?

A Yes.

Q And *in 1998 when you bought a house, how was that house titled?*

A *Reginald Eugene Puller and Olivia Puller.*

Q I see *the deed of trust is written out to Reginald Puller and Olivia Taylor Puller;* is that right?

A *That's right.*

Q And back in 1998 that's how you listed your name on that house, is that right?

A Yes.

Q And Exhibit 112, when you bought that house you had to go to a notary, didn't you?

A Yes.

Q And, in fact, *at that notary you signed your name Olivia Taylor Puller, is that correct?*

A *Yes.*

(Emphasis supplied).

Garlock demeans as unworthy of any significance the fact that when the Pullers applied for a bank loan in 1998 to assist

in the purchase of their home, it was financially advantageous for them to be recognized as husband and wife. Garlock alleges, "Mr. Puller and Ms. Taylor considered themselves husband and wife only when it would be most beneficial to them, such as on applications for bank loans." In reply brief, Garlock again alleges, "This case is a prime example of financial interests motivating the desire to establish a common law marriage."

That would seem, ironically, to help prove Mrs. Puller's case. There may, of course, be many reasons for wishing to be man and wife, and there is no value hierarchy among such reasons. A good reason to get married may as readily be to placate the banking community as to satisfy the moral exhortations of the Archbishop of Canterbury. The practical advantage of being married when negotiating a loan to buy a house, therefore, supports the inference of a marriage between Mr. and Mrs. Puller, rather than discounts it.

On his tax returns, two of Mrs. Puller's grandchildren were listed as dependents by Mr. Puller.

Q Now, we noticed on the tax records that Mr. Puller claimed two dependents. Who were those two people?

A My grandchildren.

Q All right. And how many grandchildren were living with the two of you then?

A Four.

Referring at one point to three of her grandchildren, Mrs. Puller testified:

Q *And what did those three grandchildren call Reggie?*

A *Granddad.*

(Emphasis supplied).

Referring at another point to all four grandchildren, Mrs. Puller further recounted:

Q Since that period of time, have you been raising all four of those children?

A Yes, I have.

Q And *what did they all consider Mr. Puller?*

A *As their grandfather. That's the only father they knew.*

(Emphasis supplied).

Mr. and Mrs. Puller held themselves out to other people as husband and wife.

Q *When you would go out and introduce each other to people, how would you introduce each other?*

A *As my husband.*

(Emphasis supplied).

Mrs. Puller described the daily routine and the division of labor in the Puller household.

Q All right. Who took care of the house and the chores around the house?

A Well, we kind of shared that. Sometimes he would do the clothes but he always wanted me to do the lighter stuff. And the dishes he done himself most of the time because he was very particular when it got to the dishes.

Q What about the outside?

A He did the hedges, mowing the yard. We have a big yard, front and back, and he liked to take care of that. But the boys would assist him sometimes.

Mrs. Puller recounted the moment when she and Mr. Puller, together, got the news about his mesothelioma.

That was the worst day of our lives, just cried and cried. And he said that he wasn't afraid of dying, but he was afraid of leaving me to raise those kids.

That's what he told the doctor. That's what he looked at me and said. *He goes, I'm not afraid of dying, I'm just afraid to leave you by yourself here with these children.*

(Emphasis supplied).

Mrs. Puller further explained that the formal wedding ceremony of 2002 was prompted, in significant measure, by their desire to avoid problems with the Social Security Administration. She also explained why she continued to use the name "Olivia Taylor."

Q But *you did get formally married in February of 2002?*

A *Only because Social Security*—Reggie's Social Security outweighed mine. *When he started getting his Social Security, they put me down as his spouse,* so that meant— *the man at the Social Security office told him that he didn't think I would be able to get his Social Security if something happened.*

Reggie suggested his social Security outweighs mine, his money is bigger, so therefore if something happened to him, I would be able to keep the house going. Mine alone wouldn't have kept it going. *That was one reason we decided to get married.*

Q *During the years you lived together, you never took Mr. Puller's last name, correct?*

A *No. My name is under Olivia Taylor. It's on my Social Security. I worked under that name for exactly 34 years, and I didn't want to go through getting all that legal stuff done.*

*I have had this name since my first marriage since I was 19. So then I had a Social Security card this is what my Social Security card had,* so this is what I worked on. *So I just continued to work under that name.*

Q But as soon *as you got married in 2002,* February, *you did take Mr. Puller's name?*

A *I still used my name on my job, still Olivia Taylor. That's my name on everything. I took his name, but my Social Security is still the same.*

(Emphasis supplied).

In his Memorandum Opinion denying Garlock's post-trial motions, Judge Schwait summarized the evidence that was the basis for his decision to submit the issue of the Pullers' common-law marriage to the jury.

*The testimony* relevant to the Puller consortium issue *presented the jury with a question of fact* and the jury found that the Pullers had a common law marriage based on (1) *The Pullers had lived together continuously for more than*

*ten years* (2) *they held themselves out as a married couple* (3) *Mr. Puller considered Mrs. Puller's children as his own* (4) Mrs. Puller administered and cared for Mr. Puller during his final illness (5) *Mrs. Puller considered Mr. Puller to be her husband* (6) *they considered themselves as common law husband and wife* (7) *they used joint checking accounts to pay bills* (their checks had both names on them and listed one address for both of them), (8) *their house,* purchased in 1998, *was titled in both names* (9) *Mrs. Puller considered her name to be Olivia Taylor Puller* (10) Mr. Puller on his tax return claimed two of Mrs. Puller's grandchildren as his dependents (11) *in public Mrs. Puller introduced Mr. Puller as her husband* and (12) Mr. Puller supported four of Mrs. Puller's grandchildren.

(Emphasis supplied).

Judge Schwait was not in error in submitting the issue to the jury. By any conceivable standard of measurement, there was evidence sufficient to generate a genuine issue of fact.

As we bid fond farewell to the subject of common-law marriage, an observation on the use of language from the caselaw may be in order. Mrs. Puller should treasure every phrase from an opinion such as *Blaw–Knox v. Morris, supra,* because the very tone of the opinion vibrates with a rousing endorsement of the common-law marriage found to exist in that case. Conversely, Garlock should embrace every phrase from the opinion in *Coates v. Watts, supra,* because that opinion reeks with contempt for the common-law marriage before it. Let it never be forgotten, however, that the decision in *Blaw–Knox v. Morris* had held that a common-law marriage existed, whereas the decision in *Coates v. Watts* had held that a common-law marriage did not exist.

Far from being completely contradictory, the two opinions share a telltale characteristic. Judicial opinion writers, as a breed, invariably strive to cast the decisions they are explaining in the best of all possible lights. The opinion is designed to sell a product. The editorial tone of an opinion, therefore, especially when "full of sound and fury," must always be taken

with a grain of salt. Every clever line is not the Magna Charta.

## 7. Garlock's Cross–Claims Against Keeler and Uniroyal

The Puller plaintiffs, in addition to suing Garlock, initially had sued other defendants, including 1) Walter E. Campbell Company ("WECCO"); 2) A.W. Chesterton ("Chesterton"); 3) Keeler/Dorr–Oliver ("Keeler"); and 4) Uniroyal. Prior to trial, the Puller plaintiffs settled their claims against all four of those defendants. Garlock, however, filed cross-claims against the four, seeking contribution from them should it be found liable.

At the end of the case, Garlock's cross-claims against the four were submitted to the jury. The jury found that the asbestos-containing products of both WECCO and Chesterton were substantial contributing factors to Puller's mesothelioma, but that the products of both Keeler and Uniroyal were not. The verdict sheet and verdict were as follows:

1. Do you find by a preponderance of the evidence that Reginald Puller's exposure to asbestos-containing products manufactured, sold, supplied and/or distributed by any of the Cross–Defendants listed in this question was a substantial contributing factor in the development of his mesothelioma?

| | | |
|---|---|---|
| Walter E. Campbell | Yes ✓ | No |
| Keeler-Dorr Oliver | Yes | No ✓ |
| Uniroyal | Yes | No ✓ |
| A.W. Chesterton | Yes ✓ | No |

Garlock's present contention, as expressly framed by Garlock, is as follows:

The trial court erred in denying *Garlock's Motion for Judgment* as to the cross-claims against Keeler and Uniroyal when the evidence against Keeler and Uniroyal was uncontroverted and supported by Plaintiffs' admissions and pleadings.

(Emphasis supplied). It is that precise contention which we shall consider, and nothing more. Taking a look at a direct contention does not open a Pandora's Box of indirectly related contentions.

Garlock contends that Judge Schwait should have granted judgments, as a matter of law, in its favor as to its cross-claims against Keeler and Uniroyal, and that the issue of whether their asbestos-containing products were or were not a substantial contributory factor in the development of Puller's mesothelioma should never have been submitted to the jury. In a nutshell, Garlock claims that its motion for judgment on this issue was erroneously denied.

Incomprehensibly, Garlock, in seven tightly-packed pages of argument, never quotes from the motion that it alleges was erroneously denied, so that we might know precisely what such motion consisted of. Nor does Garlock ever point to a location in the record or the record extract where the motion in question was ever made, argued, and denied. The record itself fills five good-sized packing boxes. The three-volume record extract runs to 1721 pages. We are not about to plunge into a haystack to look for a needle. It would pile further insult upon injury to discover that, in fact, there was no needle.

In answering another unrelated contention, however, we located those places in the record where motions for judgment in its favor were made by Garlock. On May 3, 2004, Garlock, pursuant to Maryland Rule 2–519, made its "motion for judgment at the end of the plaintiff's case." It sought a judgment against the Puller plaintiffs, to be sure, but not against anyone else. The detailed supporting argument was four-fold. It 1) challenged the common-law marriage between the Pullers; 2) questioned the evidence of Puller's exposure while at the National Institute of Health; 3) argued for the application of the statutory cap; and 4) challenged the evidentiary sufficiency in terms of substantial factor causation and product identification. That was the full extent of the motion and the sum total of what was argued before Judge Schwait.

Even more pertinently, Garlock's motion for judgment at the end of the entire case was made on the morning of May 4, 2004. The pages on which that motion was recorded were left out of the record extract, but were supplied by the appendix to the Puller brief. That motion renewed the motion that had been made at the end of the plaintiff's case. The totality of supporting argument was as follows:

> Your Honor, at this point in time *we would renew our motion for judgment* at the end of all evidence. We would incorporate our arguments and papers in Garlock's motion to dismiss, motion for summary judgment, our motion for judgment at the end of the Plaintiff's case. I think there is *insufficient evidence for substantial factor causation.* I think there is *insufficient evidence of product identification specifically at NIH.* I think there is *insufficient evidence of a common law marriage* such that it should be granted as a matter of law and not go to the jury.
>
> And I think because the Plaintiffs have argued each and every fiber contributes and all fibers including ambient air were inhaled by Mr. Puller, that it can be found by this jury that his exposure to the ambient air caused mesothelioma after 1986 which would make this a jury issue in the ordinary case, but since the burden is on the Plaintiffs to prove that the cap doesn't apply, then that matter should not go to the jury. It should be granted and *the cap imposed as a matter of law. At the very least, it should be a question for the jury.*

(Emphasis supplied).

 The bottom line is that the motion which Garlock contends was erroneously denied was never made. This contention is, therefore, not preserved for appellate review. In *Kent Village Associates v. Smith,* 104 Md.App. 507, 517, 657 A.2d 330 (1995), Chief Judge Wilner explained for this Court why, pursuant to Rule 2–519(a), the "[f]ailure to state a reason 'with particularity' serves to withdraw the issue from appellate review."

This requirement has important and salutary purposes. It implements, on the one hand, a principle of basic fairness. *A trial judge must be given a reasonable opportunity to consider all legal and evidentiary arguments in deciding what issues to submit to the jury* and in framing proper instructions to the jury. *The other parties must have a fair opportunity at the trial level to respond* to legal and evidentiary challenges in order (1) to make their own record on those issues and (2) to devise alternative trial strategies and arguments should the court grant the motion, in whole or in part. *Allowing these issues to be presented for the first time on appeal is also jurisprudentially unsound,* for it may well result in requiring a full new trial that otherwise might have been avoided.

(Emphasis supplied).

What is lacking is not merely particularity, of course, but any underlying motion at all, with or without particularity. The contention is based on an ostensible motion for judgment at the close of the entire case. It is a disembodied contention because there was no motion. A grab-bag of undifferentiated post-trial motions may not stand proxy for a phantom trial motion that never was.

## 8. Statutory Cap and Ambient Air

 Garlock's final contention is that the Puller survival action may not have arisen until after July 1, 1986, and that § 11–108(b)'s statutory cap on non-economic damages should, therefore have applied to it. Garlock's thesis is based on the alleged mesothelioma-producing risk of ambient air. "Ambient" is defined by *Webster's New Collegiate Dictionary* (1977) as "surrounding on all sides; encompassing." Ambient air is the air that people breathe every day of their lives. It is generic air. It is the layer of life-sustaining gas that fills the lower five or six miles of the atmosphere surrounding the planet Earth.

The thesis begins with Garlock's cross-examination of Dr. Edward Gabrielson and Gabrielson's acknowledgment that

minuscule traces of asbestos might be found even in apparently unoffending surrounding air.

Q: You would agree, would you not, that the background or ambient air levels of asbestos can be as high as 0.1 or 0.2 fibers per cc of air?

A: In some situations, yes, sir.

The next step in building the syllogism is establishing the premise that any asbestos exposure, no matter how slight, is too much.

No level [of asbestos exposure] is completely safe or completely risk-free for developing mesothelioma.

Dr. Laura Welch further agreed that inhaling an asbestos fiber from the ambient air, if such a thing ever actually occurred, would not be a salubrious thing to do.

Q: Well, do you exclude the background exposures from the occupational exposures, the ambient air exposures that people who aren't occupationally exposed are exposed to on a daily basis?

A: When you say ambient air, I think if I understand it correctly, you are meaning what we would get from, you know, in 1980 walking around the streets of Baltimore, what would be on the street.

Q: Sure.

A: I'm not excluding those. I think that *if someone had those exposures, those are also contributing factors because they would be fibers of asbestos.*

(Emphasis supplied).

From those premises, Garlock has drawn its conclusion that no one such as Puller could ever completely slip out from under the statutory cap of Maryland Code, Courts and Judicial Article, § 11–108(b).

(b) *Limitation on amount of damages established.*—(1) *In any action* for damages for personal injury *in which the cause of action arises* on or *after July 1, 1986,* an award for noneconomic damages may not exceed $350,000.00.

(2)(i) Except as provided in paragraph (3)(ii) of this subsection, in any action for damages for personal injury or wrongful death in which the cause of action arises on or after October 1, 1994, an award for noneconomic damages may not exceed $500,000.

(Emphasis supplied).

Puller's occupational exposure to asbestos-containing products generally and to Garlock's products specifically was confined to the years 1969 to 1978. In terms of the inapplicability of the statutory cap to his survival action, he would presumably be entitled to the exemption articulated by *Crane, Inc. v. Scribner*, 369 Md. 369, 394, 800 A.2d 727 (2002):

If that last exposure undisputedly was before July 1, 1986, § 11–108(b)(1) does not apply, as a matter of law.

Garlock's argument, however, is that Puller could not say that his "last exposure" was when he walked away from the boiler rooms in 1978. Puller did not die until November 9, 2002. He was not diagnosed with mesothelioma until October 1, 2001. Because Puller continued to breath ambient air, so runs the thesis, his exposure to some conceivable risk of inhaling a stray asbestos fiber necessarily continued even after that cut-off date of July 1, 1986. As a result, urges Garlock, Puller fell into the intermediate category of plaintiffs who straddled the July 1, 1986 meridian.

In those hopefully rare instances in which there was *exposure both before and after July 1, 1986,* and there is a genuine dispute over whether either exposure was sufficient to cause the kind of cellular change that led to the disease, the trier of fact will have to determine the issue based on evidence as to the nature, extent, and effect of the pre- and post-July 1, 1986 exposures.

369 Md. at 394, 800 A.2d 727 (emphasis supplied).

Literally as well as figuratively, Garlock is confecting a theory out of thin air. It cites neither caselaw nor statute law either discussing ambient air or diluting "exposure" to so ethereal a quality. "Exposure" within the contemplation of asbestos law means close contact with asbestos-bearing prod-

ucts such as gaskets and packing. It contemplates breathing in or being covered by asbestos dust. The remote possibility of a stray fiber being wafted upon the trade winds to a Swiss mountain top or a Polynesian atoll is not the "exposure" with which § 11–108(b) is concerned.

Garlock's theory would, in effect, drain *Crane v. Scribner* of any meaning. There could never be a "last exposure" before July 1, 1986, so long as the plaintiff was still alive on July 2, 1986 and had not yet been diagnosed with mesothelioma. It could never in such a case be ruled, as a matter of law, that the cap did not apply, although *Crane v. Scribner* clearly states that it may be so ruled. 369 Md. at 394, 800 A.2d 727. At the other end of the time continuum, there could never be an "exposure" that only began after July 1, 1986, if the plaintiff was alive before that date. It could never be ruled, therefore, that the cap did apply, as a matter of law, although *Crane v. Scribner* clearly states that it may sometimes be so ruled. *Id.* In every case in which the plaintiff breathed air both before and after July 1, 1986, there would necessarily be a jury question as to when the cause of action arose. The ambient air theory would render the opinion in *Crane v. Scribner* a nullity. That, however, is clearly not the case.

In the *Crane v. Scribner* case itself, the bottom line holding of the Court of Appeals was:

> In this case, it was undisputed that Mr. *Scribner's last exposure* to Crane's and Garlock's products *occurred well before 1986.*

(Emphasis supplied). In that Scribner did not die until November of 1995 and was not diagnosed with mesothelioma until March 1995, that holding is incompatible with Garlock's ambient air thesis and one of the two, perforce, must yield.

With dextrous sleight of hand, Garlock juggles the word "exposure" as if it were weighted down by no annoying predicate. On at least eight occasions, however, *Crane v. Scribner* carefully appended to the noun "exposure" the prepositional phrase "to the asbestos-containing products of the defendant." "[E]xposure to asbestos-containing products

manufactured, sold, or supplied by...." 369 Md. at 374, 800 A.2d 727. "[E]xposure to asbestos products." *Id.* at 376, 800 A.2d 727. "[E]xposure to Crane and Garlock products." *Id.* at 380, 800 A.2d 727. "[E]xposure to the defendant's products." *Id.* at 384, 800 A.2d 727. "[E]xposure to the defendants' products." *Id.* at 385, 800 A.2d 727. "[E]xposure to the defendant's asbestos-containing product." *Id.* at 392, 800 A.2d 727. "[P]laintiff's last exposure to asbestos (or at least to the defendant's asbestos-containing product)." *Id.* at 393, 800 A.2d 727. "[L]ast exposure to the defendant's asbestos-containing product." *Id.* at 394, 800 A.2d 727. In terms of the risk being measured against the July 1, 1986 cut-off date, some such prepositional predicate is implicit every time the word "exposure" is used. The caselaw is not dealing with a merely hypothetical risk associated with the very act of breathing. Garlock's unique thesis, we hold, evaporates into ambient air.

### III. The Cross–Appeals

Both sets of plaintiffs raise the same three contentions on cross-appeal. All three contentions involve the application of § 11–108's cap on awards for non-economic damages.

### 9. The Loss of Consortium and the Statutory Cap

On cross-appeal, both the Cichy plaintiffs and the Puller plaintiffs contend that the trial court erroneously applied § 11–108(b)'s statutory cap to their respective awards for the loss of consortium. By two separate orders filed on September 21, 2004, the trial court did, indeed, so cap the noneconomic damages for the loss of consortium awards.

In terms of when the causes of action for loss of consortium arose, the trial court apparently bought into the argument that no actual damage occurred to the respective marital relationships (and that causes of action accordingly did not arise) until the mesothelioma manifested itself in the respective husbands. Cichy was not diagnosed with mesothelioma

until March 1, 2002; Puller was not diagnosed with mesothelioma until October 1, 2001.[6]

Both of those dates were years after July 1, 1986, and if they were the pertinent triggers for the arising of the actions for loss of consortium, Crane and Garlock would be absolutely correct and the caps on damages would have been properly applied. The actual manifestation of the mesothelioma, however, is not the pertinent trigger and the caps on the loss of consortium claims were erroneously imposed.

In resolving Crane's third contention, we thoroughly analyzed *Crane v. Scribner,* 369 Md. 369, 800 A.2d 727 (2002), and its choice of the "exposure" test as the best measurement of when, for purposes of determining the applicability of § 11–108(b), a cause of action for mesothelioma arises. 369 Md. at 390–93, 800 A.2d 727. Applying that test, we earlier held that the statutory cap did not apply to the survival action brought on behalf of Cichy. The same reasoning would apply even more strongly to the survival action brought on behalf of Puller.

A claim for the loss of consortium based on an injury to one of the spouses is inextricably tied to the underlying personal injury claim (whether brought by a live plaintiff or by a survival action). In *Deems v. Western Maryland Railway,* 247 Md. 95, 108–09, 231 A.2d 514 (1967), Judge Oppenheimer discussed the symbiotic relationship between the underlying personal injury claim and the derivative claim alleging damage to the marital relationship itself.

That both spouses suffer when the marriage relationship is adversely affected by physical injury to either is a fact evidenced, if not by logic, by human experience since the institution of marriage became a basic part of our mores. *If*

---

**6.** The actual manifestation of symptoms would probably have been at some time before the actual times of diagnosis, but not appreciably so. This differential might have pushed the times of manifestation back a few weeks or months before the diagnoses, but they would not have stretched back to anywhere near 1986. In any event, the time of manifestation is immaterial.

*the husband is the one injured, it is not only the wife who is affected by reason of any resultant change of the husband's personality or ability to engage in all the intangible associations which marriage brings; he too suffers the effect of the change, if only in reaction to his wife's unhappiness.* Today, at least, it is unquestioned that the desire to have children and the pleasures of sexual intercourse are mutually shared. *If the husband's potency is lost or impaired, it is both the man and woman who are affected. If the physical injury is to the wife, she sustains the same kind of loss in the marital relation as he does in the converse situation.*

It is because *these marital interests are in reality so interdependent,* because *injury to these interests is so essentially incapable of separate evaluation* as to the husband and wife, that the conception of the joint action seems to us a fair and practical juridical development.

(Emphasis supplied).

 The two claims, albeit distinct, are nonetheless inseparable and should be tried together.

*[W]hen either husband or wife claims loss of consortium by reason of physical injuries sustained by the other as the result of the alleged negligence of the defendant, that claim can only be asserted in a joint action for injury to the marital relationship. That action is to be tried at the same time as the individual action of the physically injured spouse.*

247 Md. at 115, 231 A.2d 514 (emphasis supplied).

In further describing the closely intertwined relationship between the underlying personal injury claim and the spin-off claim for the loss of consortium, it was Chief Judge Robert Murphy in *Oaks v. Connors,* 339 Md. 24, 38, 660 A.2d 423 (1995), who first used the very apt modifier "derivative."

[A] loss of consortium claim is derivative of the injured spouse's claim for personal injury.

In that opinion, Judge Murphy described the intimately related natures of the claims.

We believe that *damages to a marital relationship are frequently inextricably intertwined with the harm sustained by the injured spouse.* As we held in *Deems,* "marital interests are in reality ... interdependent [and] injury to these interests is ... essentially incapable of separate evaluation as to the husband and wife." 247 Md. at 109, 231 A.2d 514. For example, the pain, suffering, and depression that are personal to the injured victim will inevitably affect the relationship with that persons's spouse. *Whether these injuries are claimed individually, by the marital unit, or by both, however, they constitute noneconomic damages flowing from a single source, the tortious injury to the victim spouse.*

339 Md. at 37, 660 A.2d 423 (emphasis supplied).

In *Klein v. Sears Roebuck,* 92 Md.App. 477, 493, 608 A.2d 1276 (1992), Judge Bloom pointed out for this Court how two injuries may simultaneously spring from the same tortious conduct.

*When a physical injury results to a married person as a result of someone else's tortious conduct, two injuries may arise:* (1) the physical injury to the spouse who was directly injured by the tortious conduct and (2) *the derivative loss of society, affection, assistance, and conjugal fellowship to his or her spouse.*

(Emphasis supplied).

In *Owens–Illinois v. Cook,* 386 Md. 468, 472, 872 A.2d 969 (2005), Chief Judge Bell posed one of the four questions the Court of Appeals was being called upon to answer in that case:

*[W]hen,* in a latent disease case, *a loss of consortium case arises* for purposes of the "cap" statute?

(Emphasis supplied).

The corporate defendant in that case argued strongly, even as do Crane and Garlock in this case, that different triggers should activate a loss of consortium action and an underlying injury action.

Fully cognizant of this holding and certainly appreciative of its effect in this case, to render the cap inapplicable to Mr. Gianotti's personal injury, *the petitioner urges a different result for the loss of consortium claim* and argues that such a result is required by the nature of the action and by our cases. This is so, it says, because, *such a claim being one that "arises from the loss of society, affection, assistance, and conjugal fellowship suffered by the marital unit as a result of the physical injury to one spouse through the tortious conduct of a third party," "[a] loss of consortium claim does not and cannot 'arise' until the marriage is negatively impacted by one spouse's underlying personal injury."* In further support of *its position that a different trigger applies* to a loss of consortium claim, the petitioner submits that the causes of action are separate. *The petitioner maintains this position, notwithstanding the inextricable intertwining of the loss of consortium claim and the personal injury claim underlying it* and the fact that a single cap applies to both.

Although aware that *Grimshaw considered when a loss of consortium claim arose* in the context of the cap statute and a latent disease, *holding that it arose at the same time as the predicate personal injury claim,* the petitioner maintains that it is neither persuasive nor dispositive.

386 Md. at 484–86, 872 A.2d 969 (emphasis supplied).

Judge Bell discussed the inextricable symbiosis between the respective claims.

*There is* also, we said, *an interdependence between the injury to the marital unit and the action of the defendant that causes that injury:* "whether it be the husband or wife who is injured, the negligence of the defendant directly affects the entity through its member who sustains the physical injury." Once the rule is established, the possible loss to the absent member of the entity is a direct and expectable result of the negligence.

... Thus, *"[a] loss of consortium claim is derivative of the injured spouse's claim for personal injury."*

386 Md. at 488, 872 A.2d 969 (emphasis supplied).

The two causes of action arise in the same instant and there can be no statutory cap applied to an award for the loss of consortium where there is no cap applied to the award for the underlying personal injury (in this case, the two survival actions).

*[I]t is illogical to impose a cap on non-economic damages in a loss of consortium claim where* loss of consortium is not a separate action for injury to the marriage entity and *the personal injury cause of action from which it derives is not itself subject to the cap statute.*

386 Md. at 495, 872 A.2d 969 (emphasis supplied).

In *Owens–Illinois v. Hunter,* 162 Md.App. 385, 398–99, 875 A.2d 157 (2005), the defendant argued for the imposition of the cap on the award for loss of consortium, just as Crane and Garlock argue for such an imposition here.

*Owens–Illinois contends that* the trial judge erred in rejecting its argument that *"a loss of consortium claim does not arise until the marriage is negatively impacted." The company reasons that Maryland's statutory cap* on noneconomic damages *must apply* to the Hunters' loss of consortium damages *because their marriage was negatively impacted only after the effective date of the cap.*

(Emphasis supplied).

Judge Davis's opinion pointed out that, quite to the contrary, this Court had earlier held that an underlying injury claim and a derivative loss of consortium claim arise contemporaneously.

[T]his Court has held that, *for purposes of applying the statutory cap in asbestos cases, loss of consortium claims "arise" at the time the personal injury claim arises,* even if the injury to the marriage did not actually manifest until after July 1, 1986. *Anchor Packing Co. v. Grimshaw,* 115 Md.App. 134, 166–67, 692 A.2d 5 (1997), *vacated on other*

*grounds sub nom. by Porter Hayden Co. v. Bullinger,* 350 Md. 452, 713 A.2d 962 (1998).

*Id.* at 400–01, 875 A.2d 157 (emphasis supplied).

In that opinion, 162 Md.App. at 403, 875 A.2d 157, we did not hesitate to reaffirm our earlier decision to the same effect in *Anchor Packing v. Grimshaw:*

> *We rejected the theory Owens–Illinois relies upon in Grimshaw, and we reject it again here. In asbestos exposure cases, loss of consortium claims do not arise at the time of their manifestation; they arise at the same time as the personal injury.* The trial judge did not err in concluding that the loss of consortium claim arose before the injury became manifest during the marriage; *that was exactly what we held in Grimshaw.*

(Emphasis supplied).

In both the case of Cichy against Crane and the case of Puller against Garlock, the survival actions for the direct injuries to Cichy and Puller arose prior to July 1, 1986, and, therefore, the statutory cap of § 11–108(b), as we have already fully discussed, did not apply to the awards on those claims. Because the two derivative claims for the loss of consortium arose at precisely the same times as did the underlying personal injury claims, the statutory cap should not have been applied to them either. Accordingly, this case will have to be remanded for a recalculation of damages based upon the original uncapped jury verdicts as to loss of consortium.

## 10. Erroneous Packaging of Loss of Consortium With Wrongful Death

This second contention of the cross-appellants is now moot. Having received, by our resolution of their first contention, the ultimate desideratum of no cap at all on the awards for the loss of consortium, they need no longer strive for the consolation prize of a separate cap as opposed to a combined cap on the loss of consortium award and the wrongful death award, treating the two as a single package.

■ It nonetheless behooves us to comment on what would be the inappropriateness of applying a single cap to a loss of consortium award and a wrongful death award in circumstances where they might both be subject to a cap. The two actions are absolutely distinct and do not overlap in any way. They are two causes of action that simply do not combine.

The relationship between the two is totally different from the relationship between a loss of consortium action and a survival action (or an underlying personal injury action if the victim should not die). In a situation where the statutory cap applies to an underlying personal injury action (or survival action), it would also apply to a derivative loss of consortium action. The respective awards for the underlying claim and the derivative claim would, moreover, be subject to a single cap. This was the ultimate holding of *Oaks v. Connors*, 339 Md. at 38, 660 A.2d 423:

> Accordingly, we hold that *a loss of consortium claim is derivative of the* injured spouse's *claim for personal injury* and, therefore, *a single cap for noneconomic damages applies to the whole action.*

(Emphasis supplied).

That *Oaks v. Connors* holding, however, has nothing to do with the case before us, because the underlying survival actions and the derivative loss of consortium actions are not subject to the statutory cap. Because two awards might, under other circumstances, be subject to a single cap does not suggest that the two awards are in any way subject to being combined or reduced when uncapped. Loss of consortium, albeit derivative, remains an independent action eligible for an independent recovery. *Deems v. Western Maryland Railway Co.*, 247 Md. at 115–16, 231 A.2d 514. *Oaks v. Connors* only concerns the modality for applying § 11–108(b) when that cap is applicable. It is not applicable to the survival actions or to the loss of consortium actions in this case.

■ A wrongful death action, by contrast to a survival action, does not overlap a loss of consortium action. A loss of consortium action terminates at the very moment a wrongful death action arises. In *Globe American Casualty Co. v.*

*Chung,* 76 Md.App. 524, 526–27, 547 A.2d 654 (1988), *vacated on procedural grounds,* 322 Md. 713, 589 A.2d 956 (1991), this Court contrasted a survival action (and its derivatives) with a wrongful death action.

When a victim dies because of the tortious conduct of someone else, *two entirely different types of claim may arise.* One is *a survival action* commenced or continued by the personal representative of the deceased victim, *seeking recovery for the injuries suffered by the victim and prosecuted just as if the victim were still alive.* It is called a "survival action" in the sense that the claim has survived the death of the claimant. The other is *a wrongful death action, brought by the relatives of the victim and seeking recovery for their loss by virtue of the victim's death.* A deceptive similarity inevitably results from the prominent common denominator fact that the victim has died. In other essential characteristics, however, *the two types of claim are clearly distinct.* The first arises from the tortious infliction of injury upon the victim; the second, only from the actual death of the victim. *In the first, damages are measured in terms of harm to the victim; in the second, damages are measured in terms of harm to others from the loss of the victim.* In the first, the personal representative serves as the posthumous agent of the victim; in the second, his surviving relatives do not serve as his agent at all. They act in their own behalf.

(Emphasis supplied).

Damages in a loss of consortium case only accrue while the injury victim remains alive. The damages are to the indivisible marital unit that occur while the injury victim, as an indispensable member of that marital unit, remains alive. In *ACandS v. Asner,* 104 Md.App. 608, 645, 657 A.2d 379 (1995), *reversed on other grounds, ACandS v. Asner,* 344 Md. 155, 686 A.2d 250 (1996), this Court emphatically stated:

We held, therefore, that *the death of a spouse ends the measure of damages for loss of consortium.*

(Emphasis supplied).

In that case, the opinion of Judge Bishop went on to explain:

*Loss of consortium damages are not recoverable under the wrongful death statute* because of the nature of the claim. *United States v. Streidel,* 329 Md. 533, 544, 620 A.2d 905 (1993) (stating that loss of consortium damages are associated with personal injury and are awarded to compensate the person injured). *Loss of consortium damages are not designed to compensate the party entitled to damages in a wrongful death case* for the loss of the deceased.

The survival action covers damages to which the decedent was entitled while he was alive. *Because the decedent would have been entitled, along with his spouse, to damages for loss of consortium, it follows that such damages may be awarded in the survival action as elements of loss to both the decedent and to his surviving spouse.* The wrongful death action, on the other hand, covers damages resulting from the death of the decedent. In this action, it is the survivors who recover damages that result from the death of the decedent.

104 Md.App. at 645, 657 A.2d 379 (emphasis supplied). And see *Stewart v. United Electric Light and Power Co.,* 104 Md. 332, 336–40, 65 A. 49 (1906); *Dronenburg v. Harris,* 108 Md. 597, 608, 71 A. 81 (1908); *Washington, Baltimore & Annapolis R.R. Co. v. State,* 136 Md. 103, 120, 111 A. 164 (1920); *Smith v. Gray Concrete Pipe Co.,* 267 Md. 149, 158, 297 A.2d 721 (1972).

Loss of consortium and wrongful death do not co-exist for so much as a single common moment, and the claims do not overlap in any way. A single cap, therefore, would never be appropriate as a necessary measure to prevent a double recovery.

### 11. The Cap on the Wrongful Death Awards

■ The cross-appellants will fare less well on their third and final contention. They contend that the imposition of the statutory cap on their wrongful death awards was erroneous. Judge Schwait, we hold, was absolutely correct in applying the statutory cap to those awards. Section 11–108(b)(2)(i) speaks

for itself and speaks unequivocally as it provides, in pertinent part:

> [I]n any action for damages for personal injury or *wrongful death in which the cause of action arises* on or *after October 1, 1994,* an award for noneconomic damages may not exceed $500,000.

(Emphasis supplied).

 Puller died on November 9, 2002; Cichy died on January 25, 2003. Both deaths occurred years after § 11–108(b)(2)'s cut-off date of 1994. The cause of action in a wrongful death case arises only with the actual death of the injury victim. In *Anchor Packing v. Grimshaw,* 115 Md.App. at 153, 692 A.2d 5, Judge Davis could not have been more clear.

> *A wrongful death action arises* not from the injury or commission of the tort, but *from the death of the injured party.* Globe American Casualty v. Chung, 76 Md.App. 524, 535, 547 A.2d 654 (1988). "*No action for wrongful death can be maintained until death has occurred;* a person or vessel is liable for damages when *death* ensues from the tort."

(Emphasis supplied).

In *Wittel v. Baker,* 10 Md.App. 531, 542, 272 A.2d 57 (1970), Judge Orth was equally emphatic.

> *No action for wrongful death can be maintained until death has occurred;* a person or vessel is liable for damages when *death* ensues from the tort. Code, Art. 67, § 1. And we observe that the legislature has consistently begun the limitation period within which such action shall be commenced with the date of death of the person wrongfully killed.

(Emphasis supplied).

The statute and the caselaw came together in *Crane v. Scribner,* 369 Md. at 375, 800 A.2d 727.

> Because *an essential element of a wrongful death action is the death of the person,* and it was undisputed that *Mr.*

*Scribner died after October 1, 1994*-the effective date of the cap on non-economic damages awarded in a wrongful death action—there was little disagreement that *the cap applied to the wrongful death action* filed by Mrs. Scribner and the children and that the non-economic damages awarded in that action would have to be reduced.

(Emphasis supplied).

The causes of action arose in the wrongful death cases on November 9, 2002 and January 25, 2003, respectively. There was, therefore, no error in applying the cap to the wrongful death awards.

**CASE REMANDED FOR REMOVAL OF CAPS ON AWARDS FOR LOSS OF CONSORTIUM AND FOR ANY RECALCULATION, IF NECESSARY, OF AWARD AMOUNTS; JUDGMENTS AFFIRMED IN ALL OTHER REGARDS; COSTS TO BE DIVIDED EQUALLY BE-TWEEN APPELLANTS AND CROSS–APPELLEES, CRANE AND GARLOCK.**